John Emilio **BLEFARE** and Donald Michel, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 19825.

United States Court of Appeals
Ninth Circuit.

June 8, 1966.

Ely, Circuit Judge, dissented.

Carl L. Fabbroni, Richard E. Adams, San Diego, Cal., for appellants.

Manuel L. Real, U. S. Atty., John K. Van de Kamp, Asst. U. S. Atty., Chief, Crim. Sec., J. Brin Schulman, Asst. U. S. Atty., Asst. Chief, Crim. Sec., Phillip W.

Johnson, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES and ELY, Circuit Judges, and POWELL, District Judge.

POWELL, District Judge:

Appellants were convicted of smuggling heroin into the United States from Mexico. They seek reversal of their conviction on the ground that evidence which was admitted at their trial was illegally obtained in violation of their rights under the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States of America.

The trial was by the court without a jury. Motion was made on behalf of Blefare only to suppress the narcotics and objection was made on behalf of each defendant to its introduction. The evidence consisted of two packets of 30% pure heroin expelled from the stomach of appellant Blefare and three packets of 30% pure heroin expelled from the stomach of appellant Michel. The evidence was admitted over objection and the appellants convicted. The sole question on this appeal is whether the evidence was illegally acquired.

We accept the principle that the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case. Ker v. State of California, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

The determination was made on conflicting evidence. We must consider this evidence in the light most favorable to the Government to see whether it would support the determination of the trial court that the evidence was properly admissible over objection and that the judgment of conviction is supported by substantial evidence. Noto v. United States, 367 U.S. 290, 296, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961).

Prior to March 27, 1964, Customs Agent Quinlan of San Diego was advised of a meeting in Vancouver, British Columbia, Canada, at which there were present some members of the Royal Canadian Mounted Police and the appellant Blefare. At that meeting Blefare stated that on a previous trip on February 21, 1964, he had brought back from Tijuana, Mexico, to Canada about an ounce of heroin in his stomach. He stated that he and other people were aware of rectal probes being used and that they were now swallowing heroin to bring it across the border. All of the above information was related to Agent Quinlan by Agent Underwood of Seattle, Washington, who was personally present at the meeting in Vancouver.

Agent Quinlan confirmed that Blefare had in fact been in Tijuana on February 21, 1964, and when he crossed the border had been subjected to a rectal probe which was negative. Agent Quinlan talked to Agents Gates and Maxey who had questioned Blefare on February 21, 1964.

Agent Quinlan called the agent at Blaine, Washington, and as a result information reached Quinlan that Blefare and a companion, whose name was unknown, were down in the Tijuana area. Information was also received that Blefare was smuggling narcotics from Mexico through the United States into Canada and peddling them there. The license and description of Blefare's rented automobile were obtained and a lookout was posted at the port of entry.

About 11:15 p. m. March 27, 1964, the automobile of appellants was observed coming from Mexico. It was stopped by the customs inspector at the border crossing at San Ysidro, California. Blefare was driving and Michel was seated beside him. They stated they were Canadian citizens and were bringing no merchandise from Mexico.

Appellants were taken to the search room and disrobed. A search of the clothing was negative. The arms of both appellants were heavily marked with needle marks and the experienced agents testified they evidenced the use of narcotics. Some venous marks were of recent origin. They were turned over to

Agent Quinlan who accused them of carrying narcotics in their rectums or stomachs. This they denied and stated they would not object to being examined by a doctor. There was no indication of the nature of the examination.

The appellants were taken to the office of Dr. Paul R. Salerno in San Diego, about 12 miles from the border. He was a qualified physician and licensed to practice in California. He had a degree in medicine and also one in pharmacology. The doctor noted the old and new puncture marks on both arms of both appellants. He administered a rectal probe on each appellant with their consent but without result.

Saline solution was then given the appellants to drink to produce vomiting. They did not drink it as directed but sipped it without objection. Blefare was seen by the doctor to have regurgitated an object and reswallowed it. Dr. Salerno suggested the use of a tube procedure to recover the object.

The procedure used is to pass a soft polyethylene tube, four millimeters in diameter through the nose, down the throat and into the stomach. Fluid is allowed to flow by gravity into the stomach and vomiting is induced. There is no pump. The same procedure is medically approved to remove a substance from the stomach of a child. There is no pain but some discomfort.* [1]

Blefare stated if he were allowed to rest he would not resist the use of the tube. He talked to Agent Gore alone and said that he, Blefare, had nothing in his stomach but that Michel had three bundles of heroin in his. When asked about his reswallowing he said he was only faking to allow Michel to regurgitate and stash the substance when the officers' backs were turned.

Blefare did not consent to the use of the tube. Two agents held his arms while a third held his head and the doctor inserted the tube. The tube was passed into his stomach and the solution passed through it. In a few seconds he expelled two packets containing the evidence in question. The same procedure was used on Michel, who did not object or resist, and resulted in the recovery of three packets containing the evidence here objected to.

No objection was made by Michel to the anal search or drinking of the saline solution or the insertion of the tube. He was not held. (RT 129) He agreed to "an examination" by the doctor, but the details of the proposed examination were not explained to him. There was a conflict in the evidence as to whether handcuffs were applied prior to and during the recovery of the narcotics.

The doctor testified the objects were recovered in an approved manner under sanitary conditions and the same procedure would be used on an infant that had swallowed a toxic substance.[2]

---

* References in the footnotes to RT refer to Reporter's Transcript of Proceedings, which include hearing on the Motion to Suppress Evidence, and the trial, the pages being numbered consecutively.

1. RT 178-179 (Dr. Salerno)
   "THE WITNESS: When the tube is passed through the nose, it is felt momentarily in the throat, which produces some sensation of discomfort, a gagging effect, and as soon as the subject swallows the tube, it is passed into the esophagus and down into the stomach, there is a minimal discomfort. This is a procedure that is followed routinely postoperatively, for example, after surgery, where the tube may be left in this position for many days.

"THE COURT: Is there any pain in connection with the passing of the tube from the nose to the esophagus?
"THE WITNESS: No, sir, I would not describe it as pain. I have had the tube passed on myself, and there is a minimal discomfort once it is passed."

2. RT 35-37
   "Q. Doctor, considering your experience and knowledge as a physician, was the removal of these objects from the stomach of Mr. Blefare accomplished in a medically approved manner?
   "A. Yes, sir. The procedure that was followed was the same as that followed on infants and other patients who have swallowed some toxic material, where it was deemed advisable or necessary to

Blefare testified he intended to remove the heroin from his stomach by induced vomiting or by the same method the doctor used.[3]

Alternatives to the use of the stomach tube were discussed in the doctor's testimony. He testified that he considered and rejected the use of an enema. (RT 170). The use of a laxative would be dangerous. (RT 170, 172, 175). At the least one (the larger) of the two packets, marked as Exhibit 1, would not have passed through the pyloric sphincter, or the opening between the stomach and duodenum or small intestine, even with the use of laxatives. (RT 171).

The three packets of Exhibit 2 might not pass through this pyloric sphincter because of the variation in its size in different individuals. (RT 172). The average size of a pyloric sphincter is approximately the diameter of a writing pencil. (RT 175). In not knowing the exact size of the various packets, or the exact time they had been placed in the stomach juices, it would not be "safe medical practice" to await their possible passage even with the use of a laxative.

The rubber containers can be destroyed by the action of gastric juices as they are high in hydrochloric acid content. Once the container is decomposed the

provoke emesis to empty the stomach of such material.
"Q. What steps were taken on this particular occasion with Mr. Blefare?
"A. He was first given a solution of saline in water, five per cent, to drink with the intent to provoke emesis in this manner.
"Q. And what happened, Doctor, at that point?
"A. He took the saline solution, but did not drink it down as directed. He just sipped it, taking a very small quantity, and it was noticed that after the material was taken down there was an emesis, with the material held in the mouth and re-swallowed.
"Q. How many times, Doctor?
"A. On one occasion this was definitely what had happened, and it is possible that it had happened in one or two other instances when I could not be certain that the material had been brought into the mouth.
    *       *       *       *       *
"Q. Then what happened, Doctor?
"A. It was decided to use a polyethyline tube to deliver the salt solution into the stomach quickly and effectively, and to elicit emesis with a minimum of further procedure.
"Q. Would you describe that tube as to diameter, doctor?
"A. This is a polyethyline (sic) tube, graded number ten. It is about four millimeters in diameter. It is the same size that would be used on a five or six year old child.
"Q. Is that procedure painful, Doctor?
"A. I would not describe it as painful. There is a momentary discomfort as the tube passes down into the pharynx and it is swallowed.

"Q. Then what type of fluid was permitted in the tube, and what happened?
"A. About ten ounces of chilled five percent sodium chloride or salt solution and water was delivered by gravity into the stomach.
"Q. Then what happened, Doctor?
"A. After it was delivered, the tube was removed, and vomiting occurred within a few seconds.
"Q. And then what happened?
"A. With the first vomitus there was expelled a rubber encased packet containing the material in question."

3. RT 8-9
"THE COURT: How did you plan to get the heroin out of your stomach?
"THE WITNESS: Throw it back up.
"BY MR. JOHNSON: Q. How were you going to cause yourself to throw it up?
"A. Stick my hand in my throat. There are numerous ways I could throw up.
"Q. What other ways than sticking your hand in your throat?
    *       *       *       *       *
"Q. What are these numerous ways, other than using your hands?
"THE COURT: Oh, I think you have covered that.
"THE WITNESS: Well, the stuff the doctor gave me.
"BY MR. JOHNSON: Q. Was this like the doctor gave you, the same sort of thing?
"A. Well, I don't know what it was, but that is what it was supposed to do.
"Q. You mean the doctor was there with the Customs Agents?
"A. Yes."

heroin would be liberated into the stomach. There is risk of this occurring within 48 hours. The result would be death. Once the material is liberated, the absorption is rapid. The outer layer of the container retrieved from Blefare's stomach was already somewhat eroded.

A fluoroscope was not available in the doctor's office. To use it effectively the patient would be required to swallow barium. (RT 187, 188). If he resisted, the barium would have to be placed in his stomach through the same tube as was used to insert the saline solution. The examination by fluoroscope would not remove the packets. It would only confirm what the agent and doctor knew to a reasonable certainty, that the packets were there. All of these events occurred about 1:30 a. m. on a Saturday morning, March 28, 1964.

To summarize, the agents knew before the search that Blefare had crossed the border five weeks earlier and had been searched without results, and that he stated he at that time had heroin in his stomach. They knew both appellants were addicts. Blefare was suspected of smuggling dope into Canada and selling it and Blefare told them Michel had heroin in his stomach and Blefare was seen to vomit and reswallow an object.

■ The search that resulted in the recovery of the questioned evidence was a border search. While it occurred at a place removed by 12 miles from the border, the process was a continuing one and the search was not so removed in time and distance as to cause it to lose its character as a border search. Such searches have been repeated subjects of judicial inquiry.

Ng Pui Yu v. United States, 352 F.2d 626, 630 (9th Cir. 1965);

Taylor v. United States, 352 F.2d 328, 329 (9th Cir. 1965);

King v. United States, 348 F.2d 814, 816–818 (9th Cir. 1965), cert. den'd 382 U.S. 926, 86 S.Ct. 314, 15 L.Ed.2d 339;

Bible v. United States, 314 F.2d 106, 107–108 (9th Cir. 1963), cert. den'd 375 U.S. 862, 84 S.Ct. 131, 11 L.Ed.2d 89;

Murgia v. United States, 285 F.2d 14, 16, (9th Cir. 1960).

In King v. United States, 348 F.2d 814, 817 (9 Cir. 1965) Judge Hamlin says:

"This being a border search, special rules are applicable. The statutes involved are set out in the margin.[4] (Footnote 4 quotes pertinent parts of 19 U.S.C. § 482 and § 1581.) As we said in Witt v. United States, 287 F.2d 389 at 391 (9th Cir. 1961):

'No question of whether there is probable cause for a search exists when the search is incidental to the crossing of an international border, for there is reason and probable cause to search every person entering the United States from a foreign country, by reason of such entry alone. That the customs authorities do *not* search every person crossing the border does not mean they have waived their right to do so, when they see fit. Here a precise description of the automobile in which appellant rode across the border (though not of its passengers) had been passed to the border guards as one being a possible bearer of heroin. This it was ultimately found to be. Mere suspicion has been held enough cause for a search at the border. Cervantes v. United States, 9 Cir., 1959, 263 F.2d 800, 803, note 5.'" (Emphasis original)

The use of body cavities to transport narcotics has become an accepted practice by experienced smugglers. This is evidenced by the frequency with which the cases have reached the courts. The Federal Courts have upheld a number of searches of the person in which rubber or cellophane bags of narcotics were taken from the anus of the arrested person and used in evidence against him. See:

Blackford v. United States, 247 F.2d 745 (9th Cir. 1957) cert. denied 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586;

People v. Woods, 139 Cal.App.2d 515, 293 P.2d 901 (1956), cert. denied 352 U.S. 1006, 77 S.Ct. 566, 1 L.Ed.2d 550;

Application of Woods, 154 F.Supp. 932 (N.D.Cal.1957), aff'd, 9 Cir., 249 F.2d 614, cert. denied Woods v. Heinze, 356 U.S. 921, 78 S.Ct. 705, 2 L.Ed.2d 716;

Murgia v. United States, 285 F.2d 14 (9th Cir. 1960), cert. denied 366 U.S. 977, 81 S.Ct. 1946, 6 L.Ed.2d 1265; 376 U.S. 946, 84 S.Ct. 803, 11 L.Ed.2d 769;

Denton v. United States, 310 F.2d 129 (9th Cir. 1962);

Ng Pui Yu v. United States, 352 F.2d 626 (9th Cir. 1965).

The smuggler who swallows narcotics has not been so frequently prosecuted. This may be due in part to the difficulty of detection. Some knowledge of the presence of the narcotics in the stomach of the suspect is necessary. Here the circumstances gave rise to the strong presumption that narcotics were present.

The courts have approved the use of an emetic to retrieve narcotics which have been swallowed. The following are cases in which objects have been recovered in that manner on border searches:

United States v. Michel, 158 F.Supp. 34 (S.D.Tex.1957), affirmed as King v. United States, 258 F.2d 754 (5th Cir. 1958), cert. denied 359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639. (Emetic)

United States v. Willis, 85 F.Supp. 745 (S.D.Cal.1949). (Evidence held inadmissible. Stomach pump)

Lane v. United States, 321 F.2d 573 (5th Cir. 1963), cert. denied 377 U.S. 936, 84 S.Ct. 1340, 12 L.Ed.2d 299 (Emetic)

Barrera v. United States, 276 F.2d 654 (5th Cir. 1960). (Emetic)

In Rochin v. People of State of California, 342 U.S. 165, 72 S.Ct. 205, 96 L. Ed. 183 (1952) it is stated that three deputy sheriffs went to the two-story dwelling in which Rochin lived. The outside door was open and they entered and then forced open the door of Rochin's room on the second floor. He was sitting on the side of the bed. On the night stand beside him two capsules were seen by the deputies, who asked "Whose stuff is this?" Rochin seized the capsules and put them in his mouth. The three officers then "jumped upon him" and attempted to extract the capsules, without result. He was handcuffed and taken to a hospital. At the direction of one officer a doctor forced an emetic solution through a tube into Rochin's stomach against his will. The two capsules were vomited, which were proved to contain morphine.

In the Rochin opinion the court reversed the conviction of the defendant in the State Courts of California, holding that the evidence was illegally obtained. After a discussion of the principles involved, Mr. Justice Frankfurter said:

"Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation."

There are many facts that make Rochin different than this case. It was not a border search. The officers were in the dwelling wrongfully. They forced their way into Rochin's room. They attempted by force to retrieve the capsules which he swallowed. In furtherance of their illegal entry and search they then took him to a hospital where an emetic was forced into his stomach. The opinion demonstrates that it was the entire sequence of events that shocked the conscience. It was the illegal invasion of the privacy of Rochin's home and the strug-

gle to open his mouth and remove what was there that started the chain of events.

Here a border search was in progress. The officers had every right to search for contraband. They had knowledge from which they were entitled to conclude that narcotics were present in the stomach of the two suspects. Although the appellants falsely denied the presence of narcotics in their stomachs, the officers knew they were addicts, that one stated the other had narcotics in his stomach, and one was seen to regurgitate an object and reswallow it.

The appellants, who appeared at the border Friday night at 11:00 p.m., were taken to the doctor and requested to drink a saline solution. They did not drink it as directed. There is no evidence of brutality. Each appellant was restrained with only the force necessary to permit an emetic to be delivered into his stomach to remove its contents. A similar method would be used on a five year old child.

It would shock the conscience of law abiding citizens if the officers, with the knowledge these officers had, were frustrated in the recovery and use of this evidence. It is shocking to know that these appellants swallowed narcotics to smuggle it into and through the United States for sale for profit, and chose to run the risk of the lethal substance being freed in their stomachs.

To paraphrase Judge Kaufman in United States v. Guerra, 334 F.2d 138, 147 (2 Cir. 1964):

"If we were mechanically to invoke Massiah (Rochin) to reverse this conviction, we would transform a meaningful expression of concern for the rights of the individual into a meaningless mechanism for the obstruction of justice."

The medical testimony, which is undisputed, leads to the conclusion that the method used to recover the narcotics from appellants caused no more pain or discomfort than a rectal probe which was challenged in Blackford, supra.

■ We find here no violation of appellants' constitutional rights.

Judgment is affirmed.

BARNES, Circuit Judge (concurring).

As Judge Powell has so carefully and conscientiously pointed out, the facts in this case do not resemble those of the Rochin case (342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)), as my Brother Ely would have us believe, but more closely resemble Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957).

Rochin was clearly a case involving "physical abuse." (See 342 U.S. at 167, 72 S.Ct. at 207) There the officers "were guilty of unlawfully breaking into and entering defendant's room and were guilty of unlawfully assaulting and battering defendant while in the room," and, after handcuffing him, the officers "were guilty of unlawfully assaulting, battering, torturing and falsely imprisoning the defendant at the alleged hospital."

In Rochin this "conduct * * * shocked the conscience" of the Supreme Court. It shocks mine. It disclosed methods "too close to the rack and screw to permit constitutional differentiation."

In Breithaupt, supra, the unconscious defendant was subjected to surgical procedure, without his consent. Yet, Mr. Justice Clark, writing for the Court, concluded:

"that a blood test taken by a skilled technician is not such 'conduct that shocks the conscience,' Rochin, supra, at 172 [72 S.Ct. at page 209], nor such a method of obtaining evidence that it offends a 'sense of justice,' Brown v. Mississippi, 297 U.S. 278, 285–286 [56 S.Ct. 461, 464–465, 80 L.Ed. 682] (1936)." [1] (352 U.S. at 437, 77 S.Ct. at 411.)

That any invasion of the body is determinative of the due process question

1. A majority of the Supreme Court itself, in explaining in 1953 why Irvine v. California, 347 U.S. 128 at 133, 74 S.Ct. 381, at page 383, 98 L.Ed. 561, could not

is urged by the minority in *Breithaupt supra* (352 U.S. at 441, 77 S.Ct. at 413), as the proper rule, but this is rejected by the majority opinion. Mr. Chief Justice Warren urges that due process means—

"at least that law-enforcement officers in their efforts to obtain evidence from persons suspected of crime must stop short of bruising the body, breaking skin, puncturing tissue or extracting body fluids, whether they contemplate doing it by force or by stealth." (Id. at 442, 77 S.Ct. at 414.)

And Mr. Justice Douglas urges that:

"the conception of due process is not limited to a prohibition of the use of force and violence against an accused. [citing Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948]" (Id. at 443, 77 S.Ct. at 414.)

Yet this "libertarian approach" was not approved by the majority.

The methods used and conduct pursued in *Rochin* were not the methods used or conduct pursued here. Defendant Blefare willingly acquiesced to a rectal examination. He was requested to drink an emetic, and he did, without protest or objection. Defendant Michel did not protest or object to the anal examination, the saline water swallowing or the saline solution introduced by tube. "I just didn't say anything at all." (R.T. 207) Blefare consented to be searched by a physician (R.T. 94), and protested only the swallowing of a tube—a process that without contradiction was uncomfortable but not painful, and the filling of the stomach cavity with a saline solution—a procedure frequently followed in removing foreign objects from a baby's stomach and daily used on adults in barium

be brought "under the sway of Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183," said:
    "That case [*Rochin*] involved, among other things, an illegal search of the defendant's person. But it also presented an element totally lacking here— coercion, * * * applied by a physical assault upon his person to compel submission to the use of a stomach pump. This was the feature which led to a result in *Rochin* contrary to that in *Wolf*. Although *Rochin* raised the search-and-seizure question, this Court studiously avoided it and never once mentioned the *Wolf* case. Obviously it thought that illegal search and seizure alone did not call for reversal."
In Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the *Wolf* case (Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)) was *not* overlooked. It was overruled. At page 666, 81 S.Ct. at page 1697 Mr. Justice Black, concurring, states:
    "Only one thing emerged with complete clarity from the *Irvine* case—that is that seven Justices rejected the 'shock-the-conscience' constitutional standard enunciated in the *Wolf* and *Rochin* cases."
And see note 4 in Justice Black's dissent in Griswold v. Connecticut, 381 U.S. 479, at 511–512, 85 S.Ct. 1678, at 1696–1697, 14 L.Ed.2d 510 (1965).
But the majority in *Mapp* did go back to the reasonable or unreasonable search

and seizure question of Boyd v. United States, 116 U.S. 616 (1886) and Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).
In Ker v. California, 374 U.S. 23, 31–32, 83 S.Ct. 1623, 1629, 10 L.Ed.2d 726 (1963), the first case after Mapp v. Ohio, supra, the majority opinion discloses what *Mapp* did *not* do.
    "Second, *Mapp* did not attempt the impossible task of laying down a 'fixed formula' for the application in specific cases of the constitutional prohibition against unreasonable searches and seizures; it recognized that we would be 'met with "recurring questions of the reasonableness of searches" ' and that, 'at any rate, "[r]easonableness is in the first instance for the [trial court] * * * to determine," ' id., [367 U.S.], [81 S.Ct., at 1690, 6 L.Ed.2d 1081], at 653, thus indicating that the usual weight be given to findings of trial courts."
The Court in *Ker* then re-emphasized by reiteration that "the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the 'fundamental criteria' laid down by the Fourth Amendment and in opinions of this Court applying that Amendment." (374 U.S. at 33, 83 S.Ct. at 1630.)
That is the test applied by the majority in rejecting *Rochin* as controlling.

fluoroscopic examinations. More important, the doctor performed carefully, expertly and with medical propriety precisely that which the defendants proposed to do for and to themselves. Defendant Blefare knew when he voluntarily swallowed the narcotics he would force his body to regurgitate the lethal poison; he swallowed the packets with the intention of so retrieving them for the narcotics trade—"using the stuff the doctor gave me." (R.T. 9, line 11.) It does not shock my conscience to require a defendant to do, under careful medical supervision, that which defendant himself willingly and knowingly proposed to do, without medical supervision, for his own selfish pleasure or profit,[2] particularly when there is uncontradicted medical testimony this is the only alternative to the creation of a lethal situation.

I regret to state that it is my opinion my Brother Ely's dissenting opinion generates more fury than light on the facts of this case. He leaves the record to rely on his own adjectives and nouns. I cannot think any fair-minded reading of the record could justify the intemperate language used in his dissenting opinion.

Defendants become "victims"; they are "manhandled"; that Michel's arms were held becomes "violence"; and the medically simple insertion of the tube becomes a "struggle". Although the only evidence in the record is that the giving of an emetic after the insertion of a four millimeter (or roughly $\frac{5}{16}$ of an inch) tube, even in a baby's stomach, is "the best and easiest way" (R.T. 133, lines 11–14) to produce a vomiting, and that the insertion of such a tube and its use for several days is "routine post-operatively" (R.T. 178–9), Judge Ely rejects this uncontradicted testimony for his own conclusion that because of the "struggles", this "violence", the "bleeding", and "the absence of trained medical or nursing personnel to assist the doctor in the event of rupture of the esophagus or other organs," the procedure here used cannot be a "procedure to which

babies are frequently subjected." Judge Ely thus assumes the role of doctor and advocate, and leaves that of an appellate judge.

In his opening paragraph, Judge Ely places in quotation marks an alleged statement of Agent Quinlan—that he suffered an "attack of nausea." Nowhere does Agent Quinlan so testify. Counsel for defendants—in an attempt to color the evidence—uses such language, but Quinlan actually denied he was ill. He stated:

"Q. Now what did you seek of these officers [in the other rooms on the doctor's premises], as you spoke with them after the Defendant Michel was given the cup of solution?

"A. After he was given the cup of solution?

"Q. Yes.

"A. Well to tell you the truth, I was just getting out of there. I have a sort of weak stomach, and I was just getting out of there for relief, asking someone else to go on in to sit for awhile, while I went out and had a smoke.

"Q. The rectal probing and the giving of the cup of solution made you ill, Officer?

"A. Not ill, but I didn't feel too good about it either." (R.T. 124, line 24 to 125, line 10.)

Further, whatever feeling Officer Quinlan had was unrelated in any way to the use of the tube to the stomach, for up to the time when the incident occurred no tube had as yet been used. It is the use of such tube to which my Brother Ely objects, not a rectal probe or the use of an emetic. The tube plus an emetic or an emetic alone produce a similar retching and vomiting. It seems to me too nice a distinction to automatically classify the first such result as "revolting" and "savage," while the second is not.

Again, while there is an admitted conflict in the evidence on certain points, we

2. Cf. remarks of Judge Chambers' concurring opinion in *Blackford*, supra, 247 F.2d at 754.

are required to accept the evidence which supports the finding of fact. This the majority opinion does, and states (with reference to transcript pages), the defendant Michel *made no objection whatever* to either the anal search, the drinking of the saline solution, or the insertion of the tube. In the dissent, however, (fifth paragraph) it is said "the *victims* were forceably manhandled." (Emphasis added.)

Again, my Brother Ely continues to set up straw men that he may strike them down. He states the majority opinion places "great reliance upon the fact that both defendants did disgorge illicit contraband." That the defendants did is mentioned as a fact in the case, but nowhere is it suggested in the majority opinion that the results of an illegal search can ever justify such a search.

Once again, my Brother Ely paints a bloody picture in aid of his legal position.

He asserts "the forcing of the tube into his [Michel's] stomach was attended with such violence as to induce bleeding." The facts are later enlarged so that he finds "a tube was so imperfectly jammed through and into his nose and body as to produce torn tissue and consequent bleeding."

Never once during the original hearing of the motion to suppress was there any reference to blood or torn tissue (R.T. 1–53). The *only* references in the Reporter's Transcript to bleeding occur:

(1) At page 79, referring to blood smears on Michel's arm from his injecting heroin into his arm.

(2) At page 187, the existence of any blood coming from Michel was denied.

(3) At page 203, the defendant Michel said: "After I brought up the packets, I kept throwing up and throwing up, and I brought up a little bit of blood." [3]

---

3. A point scarcely worth mentioning, but one indicative of the "aura" attempted to be placed about the facts of this case, is the continued reference in the dissenting opinion to a "stomach pump." And this is important to the dissenting opinion, because in note 1 it cites Rochin v. People of State of California, supra, as "condemning" the method of using a stomach pump, or any other "physical" treatment. I do not so read the case, as I have set forth in note 1 above; it condemns "illegal searches", "assault and battery" and "physical abuse" and rightly so.

This use of the term "stomach pump" is sought to be justified by the dissenting opinion in its explanatory note 2 because (1) "the gravity flow" into the stomach "is so called by various witnesses through the transcript of their testimony," and because (2) in *Rochin*, supra, the Supreme Court used the term "stomach pump," and if it's good enough for the Supreme Court, it is good enough for the author of the dissenting opinion.

In *Rochin*, the term "stomach pumping process" was first rather timidly used by counsel for the defendant (R.T. 12). The witness, Officer Jones, then used the term (R.T. 34), and frequently repeated it. Counsel for the defendant in *Rochin* thereafter used it freely—even referring to what was apparently a city operated emergency hospital as a "pump station" (R.T. 40) or a "pumping station" (R.T. 42).

In *Rochin*, Dr. Edward Meir, presumably a medical doctor (although this is not shown in the record except by hearsay) was never called upon to testify. The defendant did not testify, except to give his name. No other person present at the "recovery" of the narcotics testified.

In this case, the record was entirely different. The term "stomach pump" *was* used but once or twice. And more important, Dr. Salerno, who administered the emetic, was a medical doctor in the general practice of medicine and surgery (M.D., Western Reserve University); had previously received a degree as Doctor of Pharmacology from the University of Chicago School of Medicine; and had been an instructor and assistant professor of Pharmacology in the School of Medicine at Western Reserve University in Cleveland, Ohio. He was licensed to practice medicine in Ohio and California. He testified the passage of the thin tube down the nose and throat was "simpler", "safer", and "caused less discomfort" than inserting through the mouth. (R.T. 169) He also testified *the stomach was not pumped* (R.T. 183), and that no stomach pump was used.

Thus, my Brother Ely, "in adopting the common terminology" adopts language not common to this case, and contrary to its record.

More fundamentally, I fail to see how the dissenting opinion reaches the evil it purports to be against. It does not go on to say that the "bodily intrusion" (undertaken upon reasonable cause by a border officer, but "independent of consultation with any judicial officer") would be eliminated by requiring the obtaining of a search warrant, presumably a warrant to authorize the tube feeding of an emetic. The minority opinion frankly states "there was no feasible alternative procedure to enable the officers to search appellants' stomach." Should misguided law violators be freed to permit them to produce their own vomiting, in their own way, or, if this were not done, to die? Neither course could suffice, and recognizing this, the dissenting opinion merely suggests that we should pass on each case as to whether the search was reasonable or was not reasonable. He concludes it was not reasonable here—because of the possibility of obtaining a search warrant. Assuming that a search warrant could properly be issued for a border search, I fail to see how the warrant would make the actual performance of the search by emetics more reasonable.

I prefer the Fifth Circuit solution to the problem. King v. United States, 258 F.2d 754 (5th Cir. 1958); Ramirez v. United States, 263 F.2d 385 (5th Cir. 1959); Barrera v. United States, 276 F.2d 654 (5th Cir. 1960); Lane v. United States, 321 F.2d 573 (5th Cir. 1963), cert. den. 377 U.S. 936, 84 S.Ct. 1340, 12 L.Ed.2d 299 (1964). And see, as to anal border searches: Denton v. United States, 310 F.2d 129 (9th Cir. 1962); and discussion in Blackford v. United States, 247 F.2d 745 (9th Cir. 1957), cert. den. 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586 (1958).

I have in mind that this was a border search, which Rochin v. People of State of California, supra, was not. A border search is unique. Landau v. United States Attorney, 82 F.2d 285 (2d Cir.), cert. den. 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389 (1936); Boyd v. United States, 116 U.S. 616, 623–624, 6 S.Ct.

524, 29 L.Ed. 746 (1886); King v. United States, supra. Because it is a border search cannot make any conduct reasonable, but it probably makes searches lawful that would not be such within the United States (as for example, a search without probable cause, but based on mere suspicion). I note particularly the line drawn in the last full paragraph of the King opinion between the King case facts and those in Rochin v. People of State of California, supra, Irvine v. People of State of California, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954), and Breithaupt v. Abram, supra. I also note the denial (for what it is worth) by an eight to one vote of a petition for certiorari in King (359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639 (1959)). This was followed by the unanimous denial by the Supreme Court of a petition for certiorari in Lane v. United States, supra, where the Fifth Circuit drew the line between evidence produced by an emetic "hesitantly taken" (321 F.2d at 576) but without violent force, and the Rochin facts of emetic forced by "assault, battery and torture."

Under all the circumstances peculiar to this case, this was a reasonable search and seizure. The district court so found, and its factual finding should be affirmed. Blackford v. United States, supra, 247 F.2d at 751. The officers used the only procedure available to them, and did it in a humane, careful and scientific manner.

ELY, Circuit Judge (dissenting):

I dissent. The search procedure which my Brothers condone was, if not savage, so repugnant to the provisions of the Fourth and Fifth Amendments as to offend my judicial sensibility. That it was such as to "do more than offend some fastidious squeamishness or private sentimentalism" finds support in the recorded testimony of Agent Quinlan, the supervising officer, that during the procedure and when "they [the defendants] were retching and vomiting", he himself suffered an "attack of nausea" and removed himself from the revolting scene.

Even if this prearranged medical procedure, at an office twelve miles from the international frontier, constituted a "border search", that conclusion supplies no justification for conduct which is a "shocking" violation of the prohibition of the Fifth Amendment and an "unreasonable search" in violation of the Fourth Amendment. That a search is a "border search" eliminates certain requirements which are usually demanded, but it does not and should not eliminate the fundamental requirements that searches not be "shocking" and that they not be "unreasonable."

In attempting to justify its unprecedented decision, the majority places great reliance upon the fact that both defendants did disgorge illicit contraband and thus were indeed guilty of a most degrading form of criminal activity. This emphasis, while understandable, does not, in my humble judgment, meet the issue. I share the attitude of my Brothers toward the detestable and depraved conduct in which the appellants engaged, but if the majority is implying that the procedure harmonized with constitutional requirements because contraband was recovered, then it would follow that had the physician cut into the bowels of the suspects with a knife and removed the narcotics by hand, or if the disgorging of the material should have been induced by the screw or the rack or any other form of torture, the recovery would have met the majority's test of constitutionality.

There cannot, under the guiding principles of our democracy, be one law for the lawful and another for the lawless. The record reveals that at the border point here involved, "millions" of people enter the United States each year. I cannot be content with the prospect that a border officer may, independent of consultation with any judicial officer, make the unquestionable determination that any one of these transients who is under suspicion because of information deemed by the officer to be "reliable" may be subjected to such an extensive bodily intrusion as that which concerns us here.

In the majority opinion, as well as in the concurring opinion in which my Brother Barnes seeks to fortify it,[1] there is a suggestion that the defendants may have "consented" to the search. It is said that they voiced no objection at the border itself or to the anal search at the doctor's office twelve miles away or to the voluntary taking of the saline solution by mouth. But my Brothers can hardly find consent to the stomach pumping[2] process when during it, the victims

---

[1] None of the cases cited by Judge Barnes treats of the employment against resistance of a stomach-pumping process, the insertion of a tube or other conduit into a suspect's body as a means of injecting an emetic. The Supreme Court has condemned the method in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Several of the cases cited in the concurring opinion are concerned with the legality of anal border searches. Denton v. United States, 310 F.2d 129 (9th Cir. 1962); Blackford v. United States, 247 F.2d 745 (9th Cir. 1957). Others, while involving the ingestion of emetics, reveal that the emetics were administered orally by swallowing. Lane v. United States, 321 F.2d 573 (5th Cir. 1963), cert. denied, 377 U.S. 936, 84 S.Ct. 1340, 12 L.Ed.2d 299 (1964); 381 U.S. 920, 85 S.Ct. 1551, 14 L.Ed.2d 440 (1965); Barrera v. United States, 276 F.2d 654 (5th Cir. 1960); King v. United States, 258 F.2d 754 (5th Cir. 1958), cert. denied, 359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639 (1959). In two of them the court noted that the suspect voluntarily swallowed the substance. Lane v. United States, supra; King v. United States, supra. In none does it appear that a medical or surgical instrument was forced into a suspect's body against his will, and in none of them was there, as here, such tearing of tissue as to induce bleeding. Therefore, I do not view the cases cited in the concurring opinion as constituting any valid authority whatsoever for the sanction of the extreme and radical search which the majority approves, and undertakes to justify, in the case at hand.

[2] The process did not involve the use of a pump in the sense of a mechanical device for the forcible propulsion of liquid; hence, the majority opinion carefully emphasizes, "There is no pump". However, the process involving the insertion,

were forcibly manhandled by "at least" three officers and when it is the undenied fact that as to Michel, the forcing of the tube into his stomach was attended with such violence as to induce bleeding. The spectacle so revolted one of the participating officers, a man considerably experienced in the anal searches of border transients, that he, as has been mentioned, could not tolerate it and, sick and nauseated, left the room. The suggestion of "consent" would seem to have been put at rest by the district judge, who remarked, as to Blefare, "He has already said that he didn't [consent], and I would not find that he did", and, as to both defendants, "neither one of them consented or were in a position to object to the procedure that took place."

It is said in the concurring opinion in our case that "More important, the doctor performed carefully, expertly and with medical propriety *precisely* that which the defendants proposed to do to themselves". (Emphasis mine.) "Precisely" means "exactly", and there is certainly no evidence that it was in the contemplation of either defendant that he be manhandled by armed officials and forcibly restrained while a tube was so imperfectly jammed through and into his nose and body as to produce torn tissue and consequent bleeding.

As I envision the struggles in the doctor's office late in the nighttime, the violence which was necessary to inject the tubes,[3] the retching and vomiting and bleeding, and the absence of trained medical or nursing personnel to assist the doctor in the event of rupture of the esophagus or other organs, it is impossible for me to accept the majority's depiction of the occurrence as a procedure to which "babies" are frequently subjected.

Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), teaches me that search by stomach pump is unlawful under the Fifth Amendment. Until now, there has been no authority to the contrary. My Brothers undertake to distinguish *Rochin*, Judge Powell writing, "It [the search in *Rochin*] was not a border search. The officers were in the dwelling wrongfully. They forced their way into Rochin's room. They attempted by force to retrieve the capsules which he swallowed. In furtherance of their illegal entry and search they then took him to a hospital where an emetic was forced into his stomach." As to the challenged conduct in *Rochin*, Mr. Justice Frankfurter wrote for the Supreme Court that it "shocks the conscience". Do the factual distinctions to which Judge Powell has pointed in the quoted language relieve us from adherence to the critical determination of the Supreme Court in *Rochin?* I think not. I cannot believe

through the nasal passage, of a portion of a thirty-inch tube into the stomach and causing a solution poured into the open end of the tube to flow by gravity into the stomach is commonly called "stomach pumping" and is so called by various witnesses through the transcript of their testimony.

A similar method of gravitational flow of an emetic through a tube was under consideration in Rochin v. California, supra, the record of which has been made available to me. There, however, there was less abusive variation, inasmuch as the tube was placed through the mouth of the victim rather than being forced through the nostrils as here. Nevertheless, the Justices of the Supreme Court have repeatedly referred to the process as "stomach pumping" and the use of a "stomach pump", and that is why, de-

spite the majority's statement that "There is no pump", I have adopted the common terminology.

3. All witnesses agree that Blefare struggled violently and was forcibly restrained by "at least" three agents. One of the officers testified that Michel required no restraint, and upon this testimony is based the majority's statement that Michel "did not object or resist" and "was not held". Considering the entire record, I choose to rely on the doctor's testimony. It was to the effect that he would have considered it unsafe medical practice to engage in the stomach-pumping operations if the subjects, being conscious, were not under restraint. He declared, repeatedly and unequivocally, that Michel was forcibly restrained in the same manner as was Blefare.

that in *Rochin* the Supreme Court was shocked by the fact that the search of *Rochin* was not a border search or that the officers were in the dwelling wrongfully or that they forced their way into *Rochin's* room. Such procedures may be improper, but they are quite frequently followed by well meaning police officers zealous in the performance of their duties. They may be offensive, but they are not "shocking". Surely, they are not such practices as described by Mr. Justice Frankfurter in *Rochin* as "methods too close to the rack and screw". It was, I believe, the extreme invasion of *Rochin's* body that shocked the conscience of the Supreme Court in *Rochin* just as it was the violent intrusion into the bodies of Blefare and Michel that, "too close to the rack and screw", shocks my conscience in the case at bar.

This reaction would seem to harmonize with the views expressed in Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). There, a sample of blood, later shown to have an alcoholic content, was withdrawn from the body of the unconscious defendant. It should be clear that the procedure would, because of the state of the victim, produce no pain whatsoever and was, from the standpoint of medical technique, far less drastic than the forcible employment of the process of stomach pumping. The majority, upholding the search, distinguished *Rochin*, but the Chief Justice, dissenting, construed the majority opinion to imply "that a different result might follow if petitioner had been conscious and had voiced his objection." 352 U.S. at 441, 77 S.Ct. at 413. If this construction is valid, then, since there was resistance and objection in the case at bar, my views are consistent with the majority opinion in *Breithaupt*. The Chief Justice, with Mr. Justice Black and Mr. Justice Douglas, rejected the majority's distinction of *Rochin*. Said the Chief Justice, "Since there clearly was no consent to the blood test, it is the nature of the invasion of the body that should be determinative of the due process question here presented." 352 U.S. at 441, 77 S.Ct. at 413. In an additional comment, directly applicable to our specific problem, he wrote,

"The stomach pump too is a common and accepted way of making tests and relieving distress. But it does not follow from the fact that a technique is a product of science or is in common, consensual use for other purposes that it can be used to extract evidence from a criminal defendant without his consent." 352 U.S. at 442, 77 S.Ct. at 413.

Mr. Justice Douglas, joined by Mr. Justice Black, interpreted the majority opinion in *Breithaupt* as did the Chief Justice, writing, "As I understand today's decision there would be a violation of due process if the blood had been withdrawn from the accused after a struggle with the police." 352 U.S. at 443, 77 S. Ct. at 414. Here, such struggles occurred, and apart from any question of consent, there were extreme violations of the sanctity of the bodies of two human beings. Here, the majority falls back upon the necessity of law enforcement, the importance of which no decent-thinking individual can deny, but, as has been frequently said in different ways, "If law enforcement were the chief value in our constitutional scheme, then due process would shrivel and become of little value in protecting the rights of the citizen." 352 U.S. at 442–443, 77 S.Ct. at 414.

Turning from the Fifth to the Fourth Amendment, the issue challenges ability to attempt delicately to balance the public's need for regulation of international border traffic with the individual's right to be free from constitutionally proscribed police activity. The same responsibility confronted our court in Blackford v. United States, 247 F.2d 745 (1957), cert. denied, 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586 (1958), involving the alleged improper admission of evidence derived from a rectal probe conducted as an incident to a lawful border arrest. There, the reasonableness of the

procedures used was upheld, but the court limited its holding to the facts before it, thereby recognizing that no standard formula could be applied to solve the infinite variety of situations that might arise in encounters between border officials and suspected smugglers. Our court stated,

> "We, as any court, can and do decide only the case before us and no other. By our decision on the facts at bar, we are not to be understood as granting carte blanche authority to subject any human being to any type of physical examination. Where the facts reveal conditions different from those here present, this Court will act to defend and protect the civil liberties and rights of wronged individuals, just as, we are certain, will the trial courts." Id. at 753.

Thus, by its own precepts, *Blackford* does no more than to furnish guidelines to aid us here.

It must be clearly kept in mind that the procedures with which we are here concerned were, if not incident to a border search, exercised in the setting of a border search. Owing to the exigencies present and the vital national interest demanding the regulation of who and what traverse our borders, the classification of border searches, in many respects, falls into a category separate from that of other searches. Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Denton v. United States, 310 F.2d 129, 131 (9th Cir. 1962); Witt v. United States, 287 F.2d 389, 391 (9th Cir.), cert. denied, 366 U.S. 950, 81 S.Ct. 1904, 6 L.Ed.2d 1242 (1961); Murgia v. United States, 285 F.2d 14, 17 (9th Cir. 1960), cert. denied, 366 U.S. 977, 81 S.Ct. 1946, 6 L.Ed.2d 1265 (1961). A border search, for example, requires no showing of probable cause. Carroll v. United States, supra; Bible v. United States, 314 F.2d 106, 108 (9th Cir.), cert. denied, 375 U.S. 862, 84 S.Ct. 131, 11 L.Ed.2d 89 (1963); Denton v. United States, supra, 310 F.2d at 132; Witt v. United States, supra, 287 F.2d at 391;

Murgia v. United States, supra, 285 F.2d at 17. A contrary rule would frustrate the customary examinations conducted by customs officials as normal incidents of the meeting of their responsibilities. Nor, as a general rule, do border searches require a warrant or an arrest. Denton v. United States, supra, 310 F.2d at 132; Landau v. United States Attorney, 82 F. 2d 285, 286 (2d Cir.), cert. denied, 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389 (1936). These propositions are uniformly accepted by the federal courts.

Despite judicial recognition of the practical considerations which impel a distinctive treatment of border searches, the fact remains that *all* searches must comply with the constitutional mandate of *reasonableness*. The Fourth Amendment to the Constitution proscribes *all* unreasonable searches, of whatever kind. Thus, the concept of reasonableness should take into account the exigencies of the border situation, but the border search must, nevertheless, fit the constitutional standard of reasonableness. Marsh v. United States, 344 F.2d 317, 324 (5th Cir. 1965).

What constitutes a reasonable search in a given situation quite naturally depends upon all the circumstances surrounding the challenged police activity. It is the very circumstance of the border setting that permits a border search without a warrant and upon the basis of mere suspicion. When, however, a search progresses beyond the conventional border inquiry and becomes one incident to a lawful border arrest, as it did and was in *Blackford*, the policy considerations excepting border searches from normal requirements become less relevant. At the same time, concern for the protection of the rights and dignity of an individual in an accusatory environment should be intensified.

In the present case, appellants were interrogated and searched at the border in the customary manner, albeit with more than ordinary zeal. After denying that they carried contraband, they remained under detention, were subjected

to an intensive search in the customs office, and were subsequently transported some 12 miles for the purpose of compelling regurgitation, as has been described. At the time Dr. Salerno, with the physical assistance of the customs agents, engaged in the resisted operation, the events were substantially removed from the border setting. They would seem more nearly identifiable with ordinary environments of individuals charged with criminal offense. These factors must be weighed in considering the reasonableness of the police activity in question, although the mere fact that the search occurred some 12 miles from the border may not necessarily divorce it from classification as a border search. Murgia v. United States, supra, 285 F.2d at 16.

The government submits a number of relevant factors in its effort to sustain the burden of proving that the search in question complied with the constitutional requirement of reasonableness. We agree that the problem of illicit narcotics is one of grave and distressing magnitude. The smuggling of narcotics into this country, producing consequent despair and destruction of human lives, is a despicable offense. Moreover, the court in *Blackford*, supra, 247 F.2d at 752, took judicial notice that the Mexico-California border is one of the most concentrated points of illicit smuggling activities. It is undeniable that the national interest demands the apprehending and punishment of outlaws so evil as to engage in the smuggling of illicit and dangerous narcotic drugs.

The government also notes the reliability of the information that appellant Blefare would smuggle narcotics by transporting the contraband across the border in his stomach. The principal information was passed by a customs officer of Seattle, Washington, and not by a criminal informant seeking to curry favor for his own personal advantage. In addition, considerable time transpired between the initial warning from Seattle and appellant's actual apprehension, enabling the San Diego Customs Office to conduct investigation to confirm the Seattle report and to enable positive identification of Blefare.

The argument which is most persuasive as justification for the government's use of stomach tubes rests on its claim that there were no alternative means by which the stomachs of the suspects might be effectively searched. As the majority recites, the testimony touched upon certain theoretical alternatives. Enemas and laxatives were rejected as possible alternatives because the rubber containers enclosing the contraband were too large to pass through the pyloric sphincter between the stomach and the small intestine. The possibility that the use of a fluoroscope might have revealed the contraband was also considered by the District Court in its hearing on the motion to suppress. It is clear that this procedure, even if assumed to be effective in detection, would have required that the subject swallow barium. Had appellants refused to consent to swallowing that opaque substance, as they declined to take more than sips of the saline solution, the customs officials would yet have been faced with the decision of whether to use the tube process to inject barium into the stomachs. And had the presence of foreign contents in the stomachs been shown by the x-ray technique, there would have remained the problem of its expulsion. The only other considered alternative was that the suspects might have been confined within a "dry cell" to allow normal body functions to take their course so that the narcotics would pass by defecation. This plan would not have been feasible, thought the District Court, because the rubber containers were too large to have passed from the stomach into the intestines through the pyloric sphincter. Finally, the testimony indicated that had the containers dissolved within the stomachs, as they were in the process of doing when recovered, the

appellants would have died almost immediately from the released poison.

I must therefore agree that there was no feasible alternative procedure to enable the officers to search appellants' stomachs. Contrary to the majority, however, I do not feel that this conclusion is dispositive of the specification of error. Holding it to be so now vests in all border officials, major and minor, trained and relatively untrained, an absolute, untrammeled discretion to engage in such drastic search procedure upon the basis of what might be shown to have been the merest whim or fancy. Since, as a general rule, neither a warrant nor the existence of probable cause is a necessary prerequisite for a border search, suspicion alone might legally justify the "stomach pumping", or, quite conceivably, the cutting open by knife, of any person, alien or citizen, crossing a border into our country. Such a rule might find acceptance in lands of tyranny, but I cannot believe that it harmonizes with those ideals which are firmly planted in our Constitution and which command a decent respect for human dignity.

Is there another available avenue which is bounded by due regard for both the public's interest and the individual's right? I believe that there is and that my Brothers should have taken it with me.

In Blackford v. United States, supra, at 749–750, it was observed that a search might be "unreasonable", within the prohibition of the Fourth Amendment, and yet not involve conduct so repugnant that it "shocks the conscience" or "offend[s] a sense of justice." Rochin v. California, supra, 342 U.S. at 172, 173, 72 S.Ct. at 209, 210. Therefore, it was really unnecessary to determine whether the conduct of the customs officials in the case at bar offends civilized standards of decency and fair play within the meaning of the due process clause of the Fifth Amendment. If, under all the circumstances, the questioned searches were "unreasonable", even if

their manner was not so shocking to my Brothers as to constitute violations of the due process right, appellants' convictions cannot be sustained.

The elements which distinguish a reasonable search from an unreasonable one are not susceptible to precise definition. The standard of reasonableness necessarily and traditionally embraces a flexible concept which permits various elements to be given varying degrees of significance depending upon the circumstances of a particular case. Certainly, one of the important factors to be first considered in judging the reasonableness of a given search is the character of the procedures used. Here, the government has established the absence of a reasonable alternative procedure for the search itself. On the other hand, it is apparent that the methods employed were severe, including physical force applied by several men. The methods were substantially more severe than those applied by the customs officials in Blackford. There, the evidence clearly demonstrated that the rectal probe involved a minimum of danger and discomfort and that "Blackford was treated civilly throughout". 247 F.2d at 752. I hold that the same cannot be said of the treatment afforded Blefare and Michel; however, it is unnecessary to indulge in conjecture. Another factor in the concept of reasonableness, when considered together with the other events and circumstances described in the record, should compel the decision that the search in question violated appellants' rights as guaranteed by the Fourth Amendment. That factor is the ample time, even more than adequate, which would have enabled the customs officials to seek proper authorization and desirable guidance from a judicial officer.

The landmark Supreme Court opinion in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), in expressly overruling Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), held that the practicability of procuring a search warrant where a search was incident to a lawful

arrest was no longer the sole test of reasonableness. The Court explicitly stated:

"What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the fact and circumstances of each case." 339 U.S. at 63, 70 S.Ct. at 434.

In this pronouncement, however, the Supreme Court did not reject as *a relevant consideration* the practicability of procuring a search warrant in a given situation. Although Mr. Justice Frankfurter's position that the practicability of procuring a search warrant was *the decisive factor* in the concept of reasonableness was not adopted in *Rabinowitz,* his dissent nevertheless underscores that the practicability of procuring a warrant should remain a relevant consideration in determining the reasonableness of a search.

"The purpose of the Fourth Amendment was to assure that the existence of probable cause as the legal basis for making a search was to be determined by a judicial officer before arrest and not after, subject only to what is necessarily to be excepted from such requirement. The exceptions cannot be enthroned into the rule. The justification for intrusion into a man's privacy was to be determined by a magistrate uninfluenced by what may turn out to be a successful search * * *." Id. at 80, 70 S.Ct. at 441.

A recent case, United States v. Bayley, 240 F.Supp. 649 (S.D.N.Y.1965), while noting the change in emphasis wrought by *Rabinowitz,* endorses the salutary principle that searches should be conducted under judicial authority when circumstances permit. The Court commented, at page 657,

"Moreover, despite the overruling of Trupiano v. United States, 334 U.S. 699, [68 S.Ct. 1229, 92 L.Ed. 1663]

* * * by Rabinowitz, * * *, the failure to procure a search warrant where (as here) it was practicable to do so is *a* factor which may still be considered in determining the reasonableness of the search. See United States v. Rabinowitz, * * *, 339 U.S. at 65–66, [70 S.Ct. 430]. * * *" (Emphasis in original.)

The record under review reveals no justification for the customs officers' failure to seek judicial approval and guidance before undertaking their extreme procedure of search. When time permits and when the contemplated search procedure is extreme, if not shockingly offensive, the search, if made without authority therefor having been sought of a magistrate, is unreasonable within the meaning of the Fourth Amendment. The customs agents in the case at bar had ample advance notice of the appellant Blefare's intention and method of operation. They prearranged that a physician, selected by themselves, hold himself in readiness for the performing of the operations, which occurred near the midnight hour. It would hardly seem to impose a harsh burden that customs officers, bent on exploring a suspect's stomach by means of an operative procedure, should be required to seek an objective, judicial evaluation, as envisioned by the writers of the Fourth Amendment, of the relative interests of the public and the individual. It is not unreasonable to assume that a magistrate might have agreed that, in the absence of feasible alternatives and in light of the reliability of advance information, the use of a stomach tube to search appellants' persons would not have constituted unreasonable intrusion. Yet it is far more compatible with the philosophy of the Fourth Amendment that such a determination be made by an objective officer of the court rather than by intensely involved and immediately frustrated law enforcement officers. Furthermore, authorization by a magistrate would doubtless include guidance, protective to both the officers and the suspect, as to arrangements for the search, including the selection of a suitable fa-

cility and of medically qualified assistants. A magistrate occupies a desirably removed position from which to reach decisions safeguarding the national interest while, at the same time, affording reasonable protection to the civil rights of individuals.

That customs officials should seek judicial authorization, where time permits, before engaging in extremely unusual invasions of the human body would appear to be a wholly reasonable requirement, a requirement which would protect the constitutional rights of individuals who cross our international borders and not significantly thwart the necessary regulation of border traffic.

In the light of the facts and the guiding principles as I see them, I am convinced that the forcible searches of appellants' persons by use of stomach tubes, without judicial sanction, were unreasonable searches within the prohibition of the Fourth Amendment and shocking, unlawful conduct in violation of the Fifth Amendment. The motions to suppress the evidence,[4] illegally obtained, should have been granted.

I would reverse the judgments of conviction.[5]

---

4. Blefare filed a motion to suppress. Michel did not, apparently because his court-appointed counsel had not been named at the time when Blefare's motion was heard. No prejudice resulted, inasmuch as the district judge held that Michel had not waived his objection and that the court's decision as to the admissibility of the evidence against Michel would be rendered as if, in his behalf, there had also been a timely motion to suppress.

5. The present concurring opinion of my Brother Barnes contains much amending language which was not present in the original draft to which my dissenting opinion made passing reference.

It is now said that I have, in expressing my views, employed "intemperate language" and that I have assumed "the role of doctor and advocate" and abandoned "that of an appellate judge". As to the latter expression of my distinguished colleague and friend, I refuse to construe it as an accusation that I have abdicated my Constitutional duty and my moral responsibility.

If I have assumed the role of a "doctor", I did not intend to do so. It would seem to be common knowledge that there is a difference between "swallowing" a tube and having one jammed through the nasal passages and that when there is "bleeding" there must necessarily be laceration or rupture of tissue. Constitutional rights should not, in my considered view, be made to depend for their application upon the quantity of the blood which is shed.

If I have reflected myself in the role of "advocate", it is only because of abiding belief that one privileged to engage in a judge's undertaking must endeavor to advocate, even to his Brothers, the guiding principles which, within the limitations of his ability to interpret, he deems to be just and controlling.

Whatever "intemperate language" I have employed cannot with propriety, be defended by me. Its character should properly rest upon the evaluation and historical judgment of minds more objective than mine is, for the moment, claimed to be.

Judge Barnes rather vigorously challenges my representation that one of the officers testified that he suffered an "attack of nausea". The basis of my representation is found at page 135 of the Reporter's Transcript where, in the testimony of Customs Agent Quinlan, there appears the following:

"Q. Will you tell the Court at what time this attack of semi-nausea or wheeziness occurred in relation to the trip to Dr. Salerno's office, and your presence there?
"A. *My attack of nausea?*
"Q. Yes.
"A. Other than this attack of *nausea*—
"Q. Or attack of semi-nausea.
"A. Well, when they were retching and vomiting.
"Q. And by 'they', you mean—
"A. Both defendants.
"Q. Both of them?
"A. Yes, sir."
(Emphasis added.)