Barbara Jean **HENDERSON**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 21190.

United States Court of Appeals
Ninth Circuit.

July 7, 1967.

Rehearing Denied Dec. 15, 1967.

---

Howard E. Beckler, Hollywood, Cal., for appellant.

Edwin L. Miller, Jr., U. S. Atty., Phillip W. Johnson, Asst. U. S. Atty., San Diego, Cal., for appellee.

Before CHAMBERS, HAMLEY and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

This case raises but one issue, the validity of a border search of appellant. In spite of her violent resistance, she was compelled to submit to a procedure whereby a medical doctor removed from her vagina two rubber packets, each about two inches in diameter, together containing 93 grams of heroin.

This court has repeatedly upheld border searches of body cavities,[1] including such searches carried out in spite of the violent resistance of the person searched.[2] However, for reasons that will appear, we do not reach such issues here. The only question we decide is whether initiation of the search was lawful.

We have repeatedly said that a border search can be undertaken without probable cause,[3] but we have also held that even in such cases, the officers must act reasonably.[4] Our recent decision in Rivas v. United States, supra, n. 1, establishes that in the case of a search of body cavities, " 'there must be a clear indication of the possession of narcotics,' " or a "plain suggestion" of the smuggling, which must be "over and beyond 'a mere suspicion.' " [5] Rivas requires, when body cavities are searched, something more than was required in the earlier decisions, which said that "mere suspicion"

1. Blackford v. United States, 9 Cir., 1957, 247 F.2d 745 (male, rectum); In re Woods, 9 Cir., 1957, 249 F.2d 614, denying certificate of probable cause in Application of Woods, N.D.Cal.1957, 154 F. Supp. 932 (male, rectum); Murgia v. United States, 9 Cir., 1960, 285 F.2d 14 (male, rectum); Denion v. United States, 9 Cir., 1962, 310 F.2d 129 (male, rectum); Blefare v. United States, 9 Cir., 1966, 362 F.2d 870 (male, stomach); Rivas v. United States, 9 Cir., 1966, 368 F. 2d 703 (male, rectum); see also King v. United States, 5 Cir., 1958, 258 F.2d 754, affirming United States v. Michel, S.D. Tex., 1957, 158 F.Supp. 34 (male, stomach). Cf. Witt v. United States, 9 Cir., 1961, 287 F.2d 389 (female; narcotic in brassiere).

2. Blackford v. United States, supra, n. 1; Denton v. United States, supra, n. 1; Blefare v. United States, supra, n. 1; Rivas v. United States, supra, n. 1; Application of Woods, supra, n. 1.

3. See cases cited, n. 1, supra.

4. Blackford v. United States, supra, n. 1, 247 F.2d at p. 751; Denton v. United States, supra, n. 1, 310 F.2d at p. 132.

5. Rivas v. United States, supra, n. 1, 368 F.2d at p. 710.

is enough.[6] The *Rivas* requirement is based upon language used by the Supreme Court in Schmerber v. State of California, 1966, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.

*Schmerber* upheld the taking of a blood sample from a person validly arrested for drunken driving, over his objection. The court held that the Fourth Amendment prohibition of unreasonable searches and seizures applies to an invasion of the body, but that the invasion there involved was not unreasonable. In so holding, the court said:

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State. In *Wolf*[7] we recognized '[t]he security of one's privacy against arbitrary intrusion by the police' as being 'at the core of the Fourth Amendment' and 'basic to a free society.' 338 U.S. at 27, 69 S.Ct. 1359. We reaffirmed that broad view of the Amendment's purpose in applying the federal exclusionary rule to the States in *Mapp*."[8]

\* \* \* \* \* \*

"That Amendment expressly provides that '[t]he right of the people to be secure in their *persons,* houses, papers, and effects, against unreasonable searches and seizures, shall not be violated \* \* \*.' (Emphasis added.) It could not reasonably be argued, and indeed respondent does not argue, that the administration of the blood test in this case was free of the constraints of the Fourth Amendment. Such testing procedures plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons' within the meaning of that Amendment." [384 U.S. at 767, 86 S.Ct. at 1834.]

\* \* \* \* \* \*

"We begin with the assumption that once the privilege against self-incrimi-

nation has been found not to bar compelled intrusions into the body for blood to be analyzed for alcohol content, the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. In other words, the questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness." [384 U.S. at 768, 86 S.Ct. at 1834.]

\* \* \* \* \* \*

"The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." [384 U.S. at 769–770, 86 S.Ct. at 1835.]

We think that, while the language quoted deals specifically with an invasion, rather than an examination, of one's body, its implications are broader. The decision emphasizes that the purpose of the Fourth Amendment is "to protect personal privacy and dignity against unwarranted intrusion by the state." To us, this means that every search must be examined in the light of the Amendment's requirement that it not be "unreasonable." And we think that this requirement applies to border searches.

This does not at all mean that border searches are not different from

---

6. See Blefare v. United States, supra, n. 1, 362 F.2d at p. 875; cf. Witt v. United States, supra, n. 1, 287 F.2d at p. 391.

7. Wolf v. People of State of Colorado, 1949, 338 U.S. 25, 69 S.Ct. 1359, 93 L. Ed. 1782.

8. Mapp v. Ohio, 1961, 367 U.S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081.

others. On the contrary, it is too well established to require citation of authority that such searches are unique, that the mere fact that a person is crossing the border is sufficient cause for *a* search. Thus every person crossing our border may be required to disclose the contents of his baggage, and of his vehicle, if he has one. The mere crossing of the border is sufficient cause for such a search. Even "mere suspicion" is not required. We assume that the same rule would apply to the contents of his or her purse, wallet, or pockets. If, however, the search of the person is to go further, if the party, male or female, is to be required to strip, we think that something more, at least a real suspicion, directed specifically to that person, should be required. And if there is to be a more than casual examination of the body, if in the course of the search of a woman there is to be a requirement that she manually open her vagina for visual inspection to see if she has something concealed there, we think that we should require more than a mere suspicion. Surely, to require such a performance is a serious invasion of personal privacy and dignity, and so unlawful if "unwarranted". Surely, in such a case, to be warranted, the official's action should be backed by at least the "clear indication", the "plain suggestion", required in *Schmerber* and in *Rivas*.

We have several times taken judicial notice of the fact that narcotics are being smuggled across the border in body cavities.[9] There is testimony in this case that between December 19 of 1963 and May 2 of 1966, at the port of entry at San Ysidro, California, there were 17 seizures of narcotics found in vaginas of women crossing the border from Mexico. This number includes the present case. There was also an unknown number of cases in which a woman, confronted with the prospect of a search, voluntarily removed the narcotic from her vagina. Counsel for appellant stipulated "that this particular method of importing contraband is common and known to Agent Maxcy." We recognize that this presents a serious problem of law enforcement, to be weighed against the individual's right to human dignity and privacy as protected by the Fourth Amendment. See Breithaupt v. Abram, 1957, 352 U.S. 432, 439–440, 77 S.Ct. 408, 1 L.Ed.2d 448.

On the other hand, the record does not show how many women who crossed the border during the same time were subjected to similar searches as a result of which nothing was found. We can also take judicial notice that many thousands of women crossed the border during the same period, and that the vast majority were not carrying narcotics in their body cavities or elsewhere. Agent Maxcy testified that he could not even make an accurate estimate of the number of women who had crossed the border during that period. He agreed that it would be absurd for him to attempt to say. These women are certainly entitled to their dignity and privacy; their interests, too, are to be weighed. That is why we think that the *Schmerber* test should be applied to the inspection to which appellant was subjected.

Appellant crossed the border in an automobile driven by one Banks. The customs officers had not received any information in relation to the car or to Banks or to appellant that would alert them to the possibility that they might be carrying narcotics. Such information did exist in *Denton, Blefare* and *Witt*, supra, n. 1. Neither appellant nor Banks was a known user of narcotics, or required to register as a person convicted of a narcotics offense, as in *Murgia* and *Rivas*, supra, n. 1. Neither was under the influence of narcotics, nor did either bear the needle marks on the arms that characterize users, as was the case in *Blackford, Blefare* and *Rivas*, supra, n. 1. Neither did either of them do or say anything to arouse suspicion, so far as

---

9. Blackford v. United States, supra, n. 1, 247 F.2d at p. 752; Denton v. United States, supra, n. 1, 310 F.2d at p. 132; Blefare v. United States, supra, n. 1, 362 F.2d at p. 874; Rivas v. United States, supra, n. 1, 368 F.2d at p. 709.

appears. The agents had not been told, by appellant or anyone else, that appellant had anything concealed in her body, as was the case in *Blackford* and *Murgia*, supra, n. 1.

The government, on the motion to suppress, did not call Customs Inspector Trumble, who was on duty when the car crossed the border, and stopped the car. It appears by hearsay testimony of another agent, Maxcy, that Trumble, who is described as an experienced agent, ranked "at least number one or number two in the apprehension of narcotic violators at the Port of Entry," "believed that he had seen, stopped and caused to be searched Mrs. Henderson on the previous occasion, at which time a gun, a small quantity of dangerous drugs, and a marijuana cigarette were found in her purse." This was about three or four weeks before. Trumble's recollection was based upon appellant's appearance, not her name. We do not know whether this was what caused him to ask her to leave the car and go to the office, or whether he first thought he recognized her when she was in the office. But it is conceded that this recollection was the sole reason for his having Inspectress Lohman, a woman, search appellant.

Mrs. Lohman took appellant to a windowless room, required her to strip, made a visual examination of her body and demanded that she bend over and, with her hands pull her buttocks apart and up to permit inspection of her vagina. Lohman testified that appellant did not cooperate in a manner permitting the inspection. She concluded that appellant was concealing something in her vagina. She found no marks on appellant's body, nor anything, such as vaseline, around her vagina. Appellant was naked for 5 or 6 minutes.

It was on the basis of Trumble's recollection and of Lohman's opinion that agent Maxcy had appellant taken to a doctor where a search, after a struggle, resulted in discovery of the heroin.

Trumble's recollection was in error, however, and there was at hand a means whereby the error could easily have been found. Agent Maxcy, after he arranged to have a further search made by a doctor, ran appellant's name through the customs files, and found out that Trumble's recollection was in error. This took 15 minutes.

We think that where, as here, a search such as Inspectress Lohman carried out is to be made, where suspicion on the part of the agent is based solely upon recollection of a prior event, somewhat removed in time, to which the woman to be searched is connected solely by recollection of physical appearance, where the means of verification is readily at hand but not used, and where the incident recalled did not involve use of a body cavity, there does not exist the "clear indication," the "plain suggestion," that *Schmerber* and *Rivas* require. At most, there is mere suspicion, which is not enough. It follows that Lohman's search violated appellant's Fourth Amendment rights.[10]

We think, too, that in this case the subsequent search, by the doctor, is

---

10. The trial judge upheld the search. He relied entirely upon Trumble's identification:

"The evidence indicates here that the initial search at the Border was prompted by mistaken identity. Evidently, one of the inspectors at the Border stated that this was the same girl who had been busted a short time previously for having pills and marijuana.

"Now, regardless of whether it is true or whether there is mistaken identity, they in good faith believed or had reasonable grounds to believe, even though it was a mistake, that she was the same person who had previously been stopped at the Border, only a short time ago.

"Probably without this I would not feel that the initial search was proper, because I come to the feeling that there must at the Border be something that prompts the search, whether it be previous record, marks, or under the influence, or something that would give them the right to have a person disrobe at the Border.

"I don't believe that they can or should be able to, for instance, make every hundredth woman or every thousandth

"fruit of the poisonous tree." [11] It is clear that the latter search was made primarily, if not solely, because Lohman's search led her to believe that appellant was carrying something in her vagina. Maxcy, who authorized it, testified:

"If Agent Lohman tells you she is unsatisfied with something, do you directly from there continue to further search?

"A. Yes, sir.

"Q. Would you clarify that last answer. You continue the search, Agent Maxcy?

"A. I always upon the completion of any search conducted by Mrs. Lohman regarding a female ask Mrs. Lohman what her opinion is, her impression, whether or not she is satisfied with the search. If she's not satisfied, then we proceed to the doctor's office. If she's satisfied, ninety-nine times out of a hundred, that's the end of it."

We do not overlook the fact that Maxcy also found in appellant's purse, before he ordered the further search, "a registration slip for an automobile made out in the name of 'Otis Lee Kimble' which is a name of, that is well known to myself and our Service." As to Kimble, Maxcy also said:

"He's of record with our Service. He has been apprehended previously for narcotic violations. It's—the information in the possession of our Service is to the effect that Kimble uses females to transport his narcotics from Tijuana, Mexico, or from the Mexican Border to the Los Angeles area, and that for the most part these females are non-users of narcotics. * * *."

"Q. And referring to your knowledge at that time, the evening of June 9th, 1965, did you have any knowledge whether or not Mr. Kimble was a peddler?

"A. I did, yes, sir.

"Q. And what knowledge was that?

"A. The fact that his name has been discussed amongst the agents in our office for a considerable amount of time. He's been the subject of several investigations. I believe he was brought to court in this district the early part of 1964, as a result of the arrest of one 'Oma Lee Brown' who was apprehended with a quantity of heroin in her possession. He was at that time and still is the subject of investigation by our office.

"Q. Where was Oma Lee Brown apprehended?

"A. I believe she was apprehended at the Port of Entry in San Ysidro.

"Q. The same one at which Barbara Henderson came across on the night of or in the date of June 9th?

"A. At the same Port of Entry, yes, sir. * * *"

"Q. At that time [June 9] did you ask her [Barbara Henderson] any questions about this Otis Kimble?

"A. I did not.

"Q. All right. To your knowledge has Otis Kimble ever been convicted of any crimes in the San Diego area or any area?

"A. I believe the last time he was down here he was acquitted. I do not have a copy of his prior arrest records, so I couldn't answer that, Counsel."

While Maxcy, in response to a somewhat leading question, said that he arranged

---

woman or every ten thousandth woman without discrimination come in and be searched. That I don't think would be proper, and I think that the cases indicate that there must be some reasonable ground for the search.
"Now, here I believe that, although there was a mistaken identity, they had the right to cause a search to be made."

We agree with the principle, but disagree with the application. We note that the finding of good faith on Trumble's part is based solely upon hearsay. There is no explanation of why Trumble was not called by the government after appellant made a prima facie showing. Who but he could demonstrate his own bona fides?

11. Wong Sun v. United States, 1963, 371 U.S. 471, 484–488, 83 S.Ct. 407, 9 L.Ed. 2d 441.

for the further search "as a result of the various information that * * * [he] had," it is apparent that he relied primarily on what Lohman told him. And what she knew she learned from an unwarranted search. Thus the subsequent search was an "exploitation of that illegality." [12]

The judgment of conviction is reversed.

CHAMBERS, Circuit Judge (dissenting):

For the normal border search of such things as cars, suitcases and handbags no showing of probable cause, or even supported suspicion, is necessary. Cervantes v. United States, 9 Cir., 263 F.2d 800. However, to conduct a border search involving intrusion beyond the body's surface, it has recently been held that there must be a "clear indication" of narcotics possession. Rivas v. United States, 9 Cir., 368 F.2d 703; and see Schmerber v. State of California, 348 U.S. 757, 86 S.Ct. 1826.

The majority correctly concludes that the "clear indication" test should be applied here. I disagree with their holding that the information in the hands of customs agents was inadequate to constitute a "clear indication" that appellant was carrying narcotics. As I read the majority opinion it seems to me that the assumption is made that Schmerber, supra, prohibits strip searches. Both Schmerber, generally, and the "clear indication" test, specifically, are concerned with searches involving intrusions of the body,* not with strip searches. I find nothing in Schmerber to compel reversal of Witt v. United States, 9 Cir., 287 F.2d 389, where this court held that a strip search was not unlawful.

The agents at the time of the vaginal probe, were in possession of the following information.

1. The statement of Customs Inspector Trumble that he believed that he had caused appellant to be stopped in the recent past and that at such time a gun, a marijuana cigarette and a small quantity of a dangerous drug had been discovered in her possession;

2. The statement of Customs Inspector Lohman (a woman) that she believed that appellant was concealing something in her body cavity. Inspector Lohman reached this conclusion after having appellant strip and examining her in the nude. Appellant resisted the attempts of Mrs. Lohman to make a visual inspection of the area she, the inspector, suspected.

3. The discovery in appellant's handbag of an automobile registration slip issued to one Otis Lee Kimble. Kimble, according to customs agents, was a known narcotics peddler who used women to bring his wares over the border. While the agents knew that Kimble had not been convicted, they knew that he had been arrested for narcotics violations and they were on the watch for him.

On the basis of the above information, the customs agents were correct in thinking that the presence of narcotics was clearly indicated. They acted properly in taking appellant to a qualified physician for the purpose of conducting the interior probe. That at the very time that the probe was being conducted the agents learned that a search of their records had revealed that appellant was not the woman stopped the previous month does not render the search violative of the Fourth Amendment. By the time the agents learned of their original mistake, appellant was ferociously resisting the doctor's examination. Her screaming and fighting were such that three women jail matrons and Inspector Lohman could not hold her without the help of two male police officers. Indeed appellant's resistance was so fierce that she succeeded in drawing blood from the breast of one of the matrons.

I know of no rule that compels the conclusion that because the original good faith identification here proved to be faulty the doctor had to stop in the very act of drawing three and one half ounces

---

12. Wong Sun, supra, n. 11, 371 U.S. at p. 488, 83 S.Ct. 407.

* Schmerber v. State of California, 384 U.S. 757, at 769, 770, 86 S.Ct. 1826.

of heroin from the body cavity. Nor does it make sense to require that customs agents must pause to verify every piece of information they receive before taking action. At a busy port of entry where both foot and vehicular traffic is heavy this would constitute too much of a burden.

The "clear indication" rule of *Rivas*, supra, is a good one. Anal and vaginal probes should not be carried out at an agent's whim. But we must be careful not to make it difficult to initiate such searches where there is real suspicion. Great quantities of narcotics enter this country every year concealed in body cavities. To impose unreal standards on our border authorities insures that the smuggler, by degrading himself, can with impunity import a substance that will inevitably contribute to the degradation of others.

The majority's decision is an erosion of *Rivas*, supra; Spears v. United States, 9 Cir., 270 F.2d 335; Blefare v. United States, 9 Cir., 362 F.2d 370; Denton v. United States, 9 Cir., 310 F.2d 129; Witt v. United States, 9 Cir., 287 F.2d 389; Blackford v. United States, 9 Cir., 247 F.2d 745. Before taking such a course, the case should go en banc, and I so vote.