UNITED STATES of America

v.

William Hardy PEDERSEN.

UNITED STATES of America

v.

Frank Robert VanSCHAIK.

Crim. Nos. 6592, 6593.

United States District Court
D. Vermont.
June 27, 1969.

---

George W. F. Cook, U. S. Atty., Rutland, Vt., for the Government.

John A. Burgess, Montpelier, Vt., for defendant, William Hardy Pedersen.

Robert B. Eldredge, Montpelier, Vt., for defendant, Frank Robert VanSchaik.

## OPINION

LEDDY, District Judge.

These cases are both criminal prosecutions for smuggling marijuana into the United States in violation of 21 U.S.C. § 176a and failing to pay transfer tax on marijuana in violation of 26 U.S.C. § 4744(a)(2). These cases have been consolidated for purposes of identical motions.

In each case, a motion has been filed to suppress certain evidence seized in connection with a search of the person of the defendants made on May 7, 1969, at the Burlington International Airport, Burlington, Vermont. A hearing was held on these motions on June 2, 1969. The sole witness at that hearing was a customs official, Joseph P. Fitzgerald, who had conducted the search at the Burlington airport. The only other evidence introduced at the hearing was the report of Mr. Fitzgerald and two envelopes, each containing three and one-half pounds of hashish, the material seized by Mr. Fitzgerald. From the testimony of Mr. Fitzgerald and the other evidence introduced, I find the following to be the facts surrounding the search and seizure made at the Burlington airport on May 7, 1969.

On May 7, 1969, Mr. Joseph P. Fitzgerald was employed by the United States Customs Office as Port Director of the port of Burlington, Vermont. At 2:00 P.M. on that day, Fitzgerald received a telephone call from an Inspector Guthrie, a United States Customs Officer, stationed at Dorval Airport in Montreal, Quebec. Fitzgerald was not personally acquainted with Inspector Guthrie. Inspector Guthrie informed Fitzgerald that two persons would arrive on flight 95 from Montreal at 3:05 P.M. He named these persons as William Hardy Pedersen and Frank Robert Van-Schaik. Fitzgerald did not know nor had he ever heard of Pedersen and VanSchaik prior to the phone call from Inspector Guthrie.

Guthrie described Pedersen as approximately six feet tall and stated that both Pedersen and VanSchaik were dressed as hippies. He also mentioned that one of the two was wearing a large hat. This description of their dress and physical appearance was apparently made only for the purpose of identification. Inspector Guthrie asked Fitzgerald to conduct an inspection of Pedersen and VanSchaik. He did not state that he had conducted a prior examination nor does the testimony of Fitzgerald show that he told Fitzgerald why he wanted them examined. He made no mention of narcotics. In fact, the testimony of Fitzgerald indicates that apart from asking Fitzgerald to conduct an examination, Inspector Guthrie's conversation related solely to identifying the individuals involved. None of Guthrie's information related to his reasons for asking Fitzgerald to examine Pedersen and VanSchaik.[1]

---

1. Mr. Fitzgerald testified as follows:

Q All right. Tell me, if you will, what Inspector Guthrie said to you on the telephone at 2:00 p.m.

A. Inspector Guthrie informed me two people would alight on Montreal 95 at Burlington, at approximately 3:05 p.m., on May 7. He gave me a descrip-

Upon receiving the telephone call from Inspector Guthrie, Fitzgerald prepared for the examination by asking Mr. Munton, a supervisor for the Federal Aviation Administration for the use of his office to conduct the examination. He told Mr. Munton that he had received a call from Montreal and that he would have to make an investigation of the baggage of Pedersen and VanSchaik.

When the flight identified by Inspector Guthrie arrived at the airport, Fitzgerald went to the door of the airplane and asked for the general declaration. He asked Pedersen and VanSchaik for their tickets and inquired if they were getting off in Burlington. When they answered affirmatively, he asked for their passports. He then asked Pedersen and VanSchaik to get off the airplane and to proceed around the side of the plane. He asked them to identify their baggage and had it taken off the baggage car. He also asked VanSchaik where he was going. VanSchaik answered that he was going to Plainfield, Vermont, to visit a friend. Fitzgerald then directed them to proceed before him into the FAA office.

Once in the FAA office, Fitzgerald asked both Pedersen and VanSchaik to put their baggage on a table. He opened the baggage and examined the contents. He also examined the sleeping bag that each carried with him. He found nothing suspicious in either the baggage or the sleeping bags. During the search of the baggage, he asked Pedersen what he was doing overseas and whether he was employed. Pedersen responded that he was camping and that he was a band member. The evidence shows no other conversations between Fitzgerald and Pedersen and VanSchaik from the time the plane arrived until after the baggage was searched. The evidence does show that Fitzgerald felt that Pedersen and VanSchaik acted like the normal tourists that he saw every day.

After examining the baggage, Fitzgerald asked Pedersen to stand up and to remove his shirt. Pedersen took off his shirt and between his belt and his body he pulled out a package wrapped in plastic. He laid it on the table and said "this is illegal." At that point, VanSchaik also removed a package from under his belt and laid it on the table. Fitzgerald identified these packages as containing hashish.

At this time, Fitzgerald called Mr. Chagnon, a customs agent stationed at Rousses Point, New York. On the advice of Mr. Chagnon, he also called the Vermont State Police. Because no one was available at the State Police barracks, he called the South Burlington, Vermont, Police Department. In response to these calls, two officers arrived from the South Burlington Police Department and two customs agents arrived from Rousses Point.

After calling the custom agent and the police but before any of these persons arrived, Fitzgerald returned to the FAA office. He asked VanSchaik to stand up and to remove his shirt, his

tion; he also gave me their names, and told me that they would be arriving on that flight and for me to check these people out.
\* \* \* \* \*
Q Did he say he had conducted an examination?
A. He didn't inform me of that, sir.
Q Did he say that he had found anything that he considered unusual?
A. The method of dress, approximately the way one fellow had a hat on. That is all.
\* \* \* \* \*
Q Now, did he give you enough specific information—and you may have reference to your notes, if you wish, Defendant's "A"—did he give you any specific information about Mr. Pedersen, other than his name?
A. No, just the name, sir.
\* \* \* \* \*
Q Now, did the officer in Montreal say anything to you on the telephone about narcotics?
A. No, sir.
Q Did he say anything about any drugs at all?
A. No, sir.
Q He just told you to conduct a search?
A. That is right, sir.

pants and his shoes and stockings. After this was done, he found another package of hashish strapped to his leg. In the same way, he apparently found another package of hashish strapped to Pedersen's leg.

Subsequently, the South Burlington police arrived and Fitzgerald asked them to stand by. When the customs agents arrived, they took custody of the hashish and placed both Pedersen and VanSchaik under arrest.

The law applicable to these motions is not in dispute although there is dispute as to the application of the law to the facts. The search made by Customs Officer Fitzgerald at the Burlington Airport was a "border search." That is, it was a search made by a customs official in connection with the entry of persons into the United States at an international port of entry. See United States v. Glaziou, 402 F.2d 8 (2d Cir. 1968).

■ It has been universally recognized that the power of customs officials to search at the border is broader than the power of other officials within the interior of the country. See Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). While border searches are not exempt from the reasonableness requirement of the Fourth Amendment, they do not require a warrant nor must they meet the rigorous standard of probable cause. See Morales v. United States, 378 F.2d 187 (5th Cir. 1967). "Typically, mere suspicion of possible illegal activity within their jurisdiction is enough 'cause' to permit a customs officer to stop and search a person." United States v. Glaziou, 402 F.2d 8, 12 (2d Cir. 1968). See 19 U.S.C. § 482 (1964).

There is no doubt that the suspicion standard must be applied in this case. Some circuit courts have held that when a search involves only a minimal intrusion into the rights of the individual, it may be performed on all persons entering the country without any suspicion of illegal activity. See United States v. Burkeen, 350 F.2d 261 (6th Cir. 1965); Rivera v. United States, 327 F.2d 791

(1st Cir. 1964). In Henderson v. United States, 390 F.2d 805 (9th Cir. 1967), the Ninth Circuit Court of Appeals defined the outer limits of that doctrine:

> Thus every person crossing our border may be required to disclose the contents of his baggage, and of his vehicle, if he has one. The mere crossing of the border is sufficient cause for such a search. Even "mere suspicion" is not required. We assume that the same rule would apply to the contents of his or her purse, wallet or pockets. If, however, the search of the person is to go further, if the party, male or female, is to be required to strip, we think that something more, at least a real suspicion, directed specifically to that person, should be required. Id. at 808.

The search in this case was clearly a strip search. The individuals were directed to remove their shirts and, thereafter, most of their other clothing. Thus, if the *Henderson* rule were applied to this case, suspicion is required to conduct the search. Moreover, the rule enunciated in *Henderson* is certainly the broadest grant of power to customs officials to conduct suspicionless searches and, it is not clear that it represents the law of this circuit. See United States v. Glaziou, supra.

The only question presented by the motions, therefore, is whether the events that transpired on May 7, 1969, prior to the strip search of Pedersen and VanSchaik were sufficient to create a reasonable suspicion in the mind of Customs Officer Fitzgerald that Pedersen and VanSchaik were engaged in illegal activity. A review of the facts shows that only two circumstances presented to Fitzgerald could possibly have raised any inference of illegal activity: (1) the way in which Pedersen and VanSchaik were dressed; (2) the phone call from Inspector Guthrie directing him to conduct a search.

■ The first of these circumstances can be given no weight in this case. The evidence shows only that Inspector Guthrie identified the mode of dress of

**673**

Pedersen and VanSchaik for the sole purpose of aiding Fitzgerald in identifying them. There is no evidence that the mode of dress created any suspicion in Fitzgerald's mind. Certainly, the mere fact that Pedersen and VanSchaik were dressed in an unusual manner is not sufficient to raise an inference that they were engaged in illegal activities.

Therefore, the suspicion in this case must come from the phone call from Inspector Guthrie. The issue of whether a phone call from another customs official to stop and search an individual can be enough to create a reasonable suspicion in the mind of the customs officer who conducts the search has arisen in one other case. In Marsh v. United States, 344 F.2d 317 (5th Cir. 1965), a customs agent received a phone call from customs agents at the border "to exercise a lookout for Mr. Martinez." On this basis alone, he conducted a search. The Court, in ordering the evidence obtained in the search suppressed, made this statement:

> In this case, however, there is simply no proof as to what, if anything, the Customs agent on the border knew which caused him to telephone Constable Hughes and ask him to arrest Martinez. There is nothing more than the Constable's bare conclusion, heretofore quoted, that "I received a call from the Custom's agent's office here in Laredo to exercise a lookout for Mr. Martinez."
>
> \* \* \* \* \* \*
>
> [T]he Government \* \* \* must show at least the circumstances known to the officers at the border which reasonably justified the request relayed to officers in the interior. Any other doctrine would render travelers who had recently entered this country subject to almost unlimited arrest and search without any cause save the simple request of a border officer to one at an interior point. In our view this cannot be squared with the test of reasonableness under the Fourth Amendment.

While there are factual differences between *Marsh* and this case, the reasoning applied in *Marsh* is equally applicable here. If reasonable suspicion may be created by a phone call from a customs officer in another country simply directing an examination, then it would be possible to search an individual in any case. If Inspector Guthrie had a reasonable suspicion that Pedersen and VanSchaik were engaged in illegal activities, then it is incumbent upon the Government to produce Inspector Guthrie and show the facts creating that suspicion. If Inspector Guthrie did not have a reasonable suspicion when he called Fitzgerald from Montreal, he cannot manufacture one by directing that a search be conducted at Burlington, the first port of entry into the United States for flight 95.

Since Fitzgerald had no reasonable suspicion that Pedersen and VanSchaik were engaged in illegal activities, the search he conducted was illegal and the evidence gained from that search must be suppressed.