**UNITED STATES of America**

v.

**Delia Aguilar SAN JUAN.**

**Crim. No. 75-46.**

United States District Court,
D. Vermont.

Dec. 29, 1975.

David A. Reed, Asst. U. S. Atty., Rutland, Vt., for the Government.

Samuel Gruber, Gruber & Turkel, Stamford, Conn., and James W. Murdoch, Wool & Murdoch, Burlington, Vt., for defendant.

COFFRIN, District Judge.

This case raises questions regarding the constitutionality of the Bank Secrecy Act which were left unanswered by the Supreme Court in *California Bankers Assn. v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). The Act (Pub.L. 91–508; 81 Stat. 1121), now codified principally in 31 U.S.C. §§ 1051, 1052, 1081–83, 1101–05, 1121, 1122, empowers the Secretary of the Treasury to promulgate regulations requiring record keeping and reporting of a wide range of domestic and foreign monetary transactions "where such reports or records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 1051. Regarding the specific coverage of the Act, it is sufficient for purposes of this opinion to note that Title I and and the implementing regulations promulgated thereunder by the Secretary of the Treasury require banks and financial institutions to maintain records of the identities of their customers, to make microfilm copies of certain checks drawn on them, and to keep records of certain other items, while Title II of the Act and its implementing regulations require reports of certain domestic and foreign currency transactions. *Shultz, supra* at 30–41, 94 S.Ct. 1494. In this case we are concerned only with that portion of Title II and its implementing regulations which require persons who transport monetary instruments exceeding $5000 into or out of the United States to file reports with the Treasury Department, disclosing, *inter alia*, the amount of money transported, the name, address and business of the person for whom the money is being transported, and the identity, address and destination of the person transporting the money.

31 U.S.C. §§ 1101(a) and 1101(b); 31 C.F.R. §§ 103.23(a) and 103.25(b).[1]

The defendant, Delia Aguilar San Juan, was charged by Information on October 22, 1975[2] with wilful failure to file the reports required in connection with her transportation of approximately $77,500 in cash from Canada to the United States on March 30, 1975 in violation of the above-named provisions. Criminal liability is sought to be im-

---

[1]. 31 U.S.C. § 1101(a) and 1101(b) and 31 C.F.R. §§ 103.23(a) and 103.25(b) provide as follows:

§ 1101. Reports—Persons required to file

(a) Except as provided in subsection (c) of this section, whoever, whether as principal, agent, or bailee, or by an agent or bailee, knowingly—

(1) transports or causes to be transported monetary instruments—

(A) from any place within the United States to or through any place outside the United States, or

(B) to any place within the United States from or through any place outside the United States, or

(2) receives monetary instruments at the termination of their transportation to the United States from or through any place outside the United States

in an amount exceeding $5,000 on any one occasion shall file a report or reports in accordance with subsection (b) of this section.

(b) Reports required under this section shall be filed at such times and places, and may contain such of the following information and any additional information, in such form and in such detail, as the Secretary may require:

(1) The legal capacity in which the person filing the report is acting with respect to the monetary instruments transported.

(2) The origin, destination, and route of the transportation.

(3) Where the monetary instruments are not legally and beneficially owned by the person transporting the same, or are transported for any purpose other than the use in his own behalf of the person transporting the same, the identities of the person from whom the monetary instruments are received, or to whom they are to be delivered, or both.

(4) The amounts and types of monetary instruments transported.

§ 103.23 Reports of transportation of currency or monetary instruments.

(a) Each person who physically transports, mails, or ships, or causes to be shipped, currency or other monetary instruments in an aggregate amount exceeding $5,000 on any one occasion from the United States to any place outside the United States, or into the United States from any place outside the United States, shall make a report thereof. A person is deemed to have caused such transportation, mailing or shipping when he aids, abets, counsels, commands, procures, or requests it to be done by a financial institution or any other person. A transfer of funds through normal banking procedures which does not involve the physical transportation of currency or monetary instruments is not required to be reported by this section.

§ 103.25 Filing of reports.

\* \* \* \* \*

(b) Reports required to be filed by § 103.23(a) shall be filed at the time of entry into the United States or at the time of departure, mailing or shipping from the United States, unless otherwise directed or permitted by the Commissioner of Customs. They shall be filed with the Customs officer in charge at any Customs port of entry or departure, or as otherwise permitted or directed by the Commissioner of Customs. If the currency or other monetary instruments with respect to which a report is required do not accompany a person entering or departing from the United States, such reports may be filed by mail on or before the date of entry, departure, mailing or shipping, with the Commissioner of Customs, Attention: Currency Transportation Reports, Washington, D. C. 20226. They shall be on forms to be prescribed by the Secretary and all information called for in such forms shall be furnished.

[2]. The defendant was originally charged by indictment filed on June 26, 1975. The indictment was subsequently dismissed and superseded by the October 22 information. Certain objections to the indictment raised by motion were withdrawn by the defendant when the superseding information was filed. By agreement of counsel, certain other motions filed by the defendant with respect to the indictment were considered to pertain equally to the information. This opinion deals only with the defendant's claim that the statute and implementing regulations are unconstitutional as applied to the defendant, although brief mention of the disposition of defendant's other motions are made at the end of the opinion.

posed pursuant to 31 U.S.C. § 1058.[3] Mrs. San Juan has moved to dismiss the information against her on the grounds that the reporting requirements violate her First Amendment right to freedom of association, her Fourth Amendment rights to freedom from unreasonable searches and seizures, and her Fifth Amendment privilege against self-incrimination.[4] Counsel for both parties have filed memoranda of law, and a hearing was held on October 29, 1975.

■ The Court believes that the Supreme Court's decision in *Shultz, supra* at 59–63, 94 S.Ct. 1494, is entirely dispositive of defendant's Fourth Amendment claim, and further discussion of that issue is unwarranted. *See also, Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) and *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

The questions raised by defendant's First and Fifth Amendment claims, though raised in *Shultz,* were left unanswered by the Supreme Court's ruling in that case that a Fifth Amendment challenge to the Act by bank depositor plaintiffs was premature, *Shultz, supra,* 416 U.S. at 72–75, 94 S.Ct. 1494, and that the First Amendment challenge of the ACLU was speculative and hypothetical. *Id.* at 75–76, 94 S.Ct. 1494. In this case, however, defendant's First and Fifth Amendment claims arise in a factual context which is entirely different from that in *Shultz.*

Mrs. San Juan was the subject of a routine border search as a passenger on board a bus passing from Canada into the United States at Highgate Springs, Vermont. The primary search in the bus led to the discovery of brown paper bags in Mrs. San Juan's suitcase, and a follow-up search in the Inspection Station revealed that the paper bags contained approximately $77,500 in cash. Customs Inspectors explained to Mrs. San Juan that she was required by law to fill out a report concerning the money she was carrying into the United States.[5] Mrs. San Juan apparently understood this explanation of the reporting requirement of 31 C.F.R. §§ 103.-23(a) and 103.25(b), but chose not to fill out the form. Whatever her motives were at that time for refusing to comply with the reporting requirement, Mrs. San Juan's constitutional claims now stand as a direct challenge to her criminal prosecution, and we are therefore obliged to consider whether those claims have merit.

Defendant's Fifth Amendment claim calls into question the scope of governmental power to compel persons crossing our national border to file reports of information which might later be used as evidence against them or lead to evidence which could be used against them in criminal prosecutions. The Government contends that the reports required by 31 U.S.C. § 1101 and its implementing regulations give rise to only minimal hazards of incrimination and are within the scope of the so-called "required records exception" to the Fifth Amendment privilege, as it was first suggested in *United States v. Sullivan,* 274 U.S. 259,

3. 31 U.S.C. § 1058 provides as follows:
 Whoever willfully violates any provision of this chapter or any regulation under this chapter shall be fined not more than $1,000, or imprisoned not more than one year, or both.

4. In her Motion to Dismiss, defendant also asserted that the Act violated "her right under the Sixth Amendment to be informed of the nature and cause of the accusations against her." Apparently, however, the defendant has concluded this claim lacks merit because she has not discussed it, nor even alluded to it, in her briefs or oral argument. We do not consider it for that reason.

5. The actual form on which the report is required to be made is Form 4790 of the Internal Revenue Service of the Treasury Department, entitled "Report of International Transportation of Currency or Monetary Instruments." It is required to be filed with the Bureau of Customs. A sample of Form 4790 was presented to the Court at the hearing on October 29, 1975 but was not offered in evidence. This sample form has now been designated Court Exhibit 1 and made part of the record for review purposes.

47 S.Ct. 607, 71 L.Ed. 1037 (1927) and later clarified in *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L. Ed. 1787 (1948). The defendant claims that the required records doctrine is inapplicable to the challenged statute and regulations and that the privilege against self-incrimination bars the Government from compelling her to file reports which later might be used against her in a criminal proceeding. As authority for her claim, defendant refers to *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), and *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), cases which substantially limit the scope and meaning of the required records doctrine.

■ In order to resolve these conflicting claims, the Court must first determine whether or not compliance with the challenged reporting requirement actually exposed the defendant to "real and appreciable" dangers of incrimination. *Brown v. Walker*, 161 U.S. 591, 599, 16 S.Ct. 644, 40 L.Ed. 819 (1896). If no such danger existed, or if the dangers were merely "imaginary and unsubstantial," *Ibid*, the Fifth Amendment would offer no protection to defendant. As stated more recently by the Supreme Court: "In order to invoke the privilege it is necessary to show that the compelled disclosures will themselves confront the claimant with 'substantial hazards of self-incrimination.'" *California v. Byers*, 402 U.S. 424, 429, 91 S.Ct. 1535, 1538, 29 L.Ed.2d 9 (1971).

At the outset, it must be observed that in comparison with reporting and registration requirements which have been held by the Supreme Court to violate the Fifth Amendment privilege, the challenged reporting requirement of the Bank Secrecy Act and Regulations exposes the persons it affects to a much lesser danger of self-incrimination. A review of the pertinent cases will illustrate this point.

*Albertson v. SACB*, 382 U.S. 70, 86 S. Ct. 194, 15 L.Ed.2d 165 (1965) was the first case to establish clear limits on government power to compel self-reporting of potentially incriminating activity. That power had earlier received Supreme Court sanction without clear limitations in *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927) and *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). In *Sullivan*, the court had held that the privilege against self-incrimination did not entitle a bootlegger to decline altogether to file an income tax return, even though specific questions in the return might call for disclosure of the illegal source of his income. In *Shapiro* the privilege was asserted against the record keeping requirements of the Emergency Price Control Act of 1942 which compelled businessmen during the war to preserve their business records for examination by the Office of Price Administration. The Court, enunciating the so-called "required records" doctrine, held that the privilege against self-incrimination was not available as to records which were "appropriate subjects of government regulation," were "ordinarily kept" by the person compelled to produce them, and had "public aspects." *Shapiro, supra* at 32–36, 68 S.Ct. 1375.

In *Albertson, supra*, the compelled disclosures were of a different nature. That case involved Fifth Amendment challenges to the registration requirements imposed upon Communists by the Subversive Activities Control Act of 1950. Compliance with those requirements constituted an admission of membership in the Communist Party and exposed the registrant to immediate prosecution under the membership clause of the Smith Act, 18 U.S.C. § 2385 (1964 ed.) and under § 4(a) of the Subversive Activities Control Act, 50 U.S.C. § 783(a) (1964 ed.), *Albertson, supra*, 382 U.S. at 77, 86 S.Ct. 194. Obviously, the dangers of incrimination created by the challenged requirements, compelling virtual admissions of criminal liability,

were far greater than in *Sullivan* or *Shapiro* or in the case at hand. The Court in *Albertson* made the following comments by way of distinction:

> In *Sullivan* the questions in the income tax return were neutral on their face and directed at the public at large, but here they are directed at a highly selective group inherently suspect of criminal activities. Petitioners' claims are not asserted in an essentially noncriminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of a crime. *Albertson, supra* at 79, 86 S.Ct. at 199.

Similarly, the cases cited in defendant's brief, *Marchetti, Grosso* and *Haynes*, each involved registration requirements exposing those affected to a very high probability of incrimination. *Marchetti* and *Grosso* held that gamblers, who were liable to prosecution in practically every state, *Marchetti, supra*, 390 U.S. at 44–45, 88 S.Ct. 697, could not be compelled by the federal wagering tax statutes to register prior to engaging in the business of accepting wagers. *Haynes* held invalid certain registration requirements of the National Firearms Act which were directed principally at persons whose possession of the firearm was illegal. *Haynes, supra* at 96, 88 S.Ct. 722. Compliance with the reporting requirements in each of these three cases was virtually the equivalent of "turning oneself in" to the authorities for prosecution. The Supreme Court has also invalidated registration provisions of the Marihuana Tax Act, which were directed again at a "selective group inherently suspect of criminal activities"—possessors of marihuana—who were subject to criminal prosecution in every state. *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1968).

In contrast, the reporting requirements of the Bank Secrecy Act and its regulations, which are under attack in this case, are not directed at a group inherently as suspect of criminal activities as in prior cases. The requirements, though not affecting "the public at large", apply to all persons travelling across the borders with more than $5,000, exempting only specified banks and trust companies and their agents, securities brokers and dealers, common carriers, and travelers check issuers. 31 C.F.R. § 103.23(c). It is safe to assume that most international travelers, even those carrying substantial sums of money, are without criminal disposition. To them, the reporting requirements pose no danger of present or future incrimination. Defendant conceded in her brief that "there is not even a rational basis . . . to conclude that the mere possession of $5,000 is related to criminal activity." In addition, the disclosures actually called for in the challenged reports are comparatively "neutral on their face," as was the case in *Sullivan* with tax returns. Form 4790 of the Department of the Treasury, Internal Revenue Service, the report which Mrs. San Juan refused to complete,[6] asked only her name, birthdate, address, nationality, passport identification, place of departure and destination, the amount of currency she was carrying, whether she was acting as an agent for anyone in transporting the money, and if so, the person's name, address and business. These disclosures, unlike disclosures of gambling, criminal possession of a firearm or marihuana, or membership in the Communist Party, would be insufficient, without more, to incriminate her. Finally, the Court notes that international travelers desiring to carry large sums of money across our borders for whatever purpose, but wishing to avoid entirely the reporting requirements challenged in this case, can accomplish both purposes simply by making multiple trips and by taking care never to transport more than $5,000 across the border at one

6. See note 5, *supra*.

time. Unlike the gamblers in *Marchetti*, who were permitted to pursue their wagering activities only by sacrificing their privilege against self-incrimination, a dilemma the Court refused to sanction, *Marchetti, supra,* 390 U.S. at 50–52, 88 S.Ct. 697, international travelers like Mrs. San Juan are permitted by the Bank Secrecy Act to pursue their foreign monetary transactions without making compulsory disclosures at the border, provided they do so in installments of $5,000 or less.

■ These significant differences, however, cannot mask the underlying purposes of Congress in promulgating the foreign reporting requirements of the Bank Secrecy Act—purposes which were fundamentally prosecutorial. The stated objective of the ·Act—to acquire information which would have a "high degree of usefulness" in criminal investigations and proceedings, 31 U.S.C. § 1051—was not "essentially regulatory." Plainly, Congress suspected that some of the persons transporting large sums of money across our borders were engaged in criminal activity. See generally, S.Rep. 91–1139 (1970); H.R.Rep. 91–975 (1970), U.S.Code Cong. & Admin. News, 1970, p. 4394; *Shultz, supra,* 416 U.S. 25–30, 94 S.Ct. 1494. It was expected by Congress that at least in some cases, compelled reports of foreign monetary transactions would lead to apprehension and conviction of tax evaders, racketeers and other persons using foreign banks for illicit purposes. The reports, not unlike the registration requirements of the Wagering Tax Statute struck down in *Grosso* and *Marchetti,* were "designed primarily for and utilized to pierce the anonymity of citizens engaged in criminal activity." *Grosso, supra,* 390 U.S. at 76, 88 S.Ct. at 717 (Brennan, J., concurring).

■ With these considerations in mind, the Court cannot say that Mrs. San Juan's fears of self-incrimination were imaginary or patently frivolous. Compliance with the self-reporting requirements necessarily exposed her to some risk of subsequent prosecution. For that reason, the reporting requirements cannot be equated with the requirements to file tax returns, upheld in *Sullivan,* or to preserve business records, upheld in *Shapiro,* or to comply with the "stop and report" auto accident requirements, most recently upheld in *California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971). Those requirements were parts of statutory schemes which were purely regulatory in nature. *Byers, supra* at 430, 91 S.Ct. 1535. The California "hit-and-run" statute upheld in *Byers,* for example, compelled drivers involved in automobile accidents to stop at the scene of the accident and leave their name and address, and was not "intended to facilitate criminal convictions but to promote satisfaction of civil liabilities arising from automobile accidents." *Id.* In contrast, the requirements now under consideration have a stated purpose of facilitating convictions.

■ Thus, it is a difficult task to evaluate defendant's claim in the light of existing Supreme Court precedent.[7] The compulsory foreign reporting requirements of the Bank Secrecy Act are neither as threatening to Fifth Amendment liberties as those struck down in *Albertson, Marchetti, Grosso, Haynes,* and *Leary* nor as innocuous as those held justifiable in *Sullivan, Shapiro,* and *Byers.* Moreover, the Court does not agree with the Government that defendant's claims can be easily dismissed under the "required records" doctrine of *Shapiro.* That doctrine is applicable only to statutes which are regulatory in nature and to records that are ordinarily kept and that have assumed public as-

---

7. "Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one." *California v. Byers,* 402 U.S. 424, 427, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1970).

**694**

pects. None of these essential factors, as already discussed, are attributable to the reporting requirements challenged here.

The Court is obliged, therefore, to resolve the ". . . tension between the State's demand for disclosures and the protection of the right against self-incrimination" by "balancing the public need on the one hand, and the individual claim to constitutional protections on the other." *Byers, supra* at 427, 91 S.Ct. at 1537. Ultimately, the validity or invalidity of the compelled disclosures depends not on labels which the Court may attach to them, such as "criminal" or "regulatory", but on the relative weight of competing governmental policies and individual liberties. *Ibid.* As suggested by Justice Harlan, "we must deal in degrees in this troublesome area." *Byers, supra* at 454, 91 S. Ct. at 1551 (J. Harlan, concurring).

In balancing competing interests the Court concludes that there is one critical factor which distinguishes the compelled disclosures attacked in this case from those struck down by the Supreme Court in other cases, requiring us to give substantial weight to the governmental interests involved. That factor is one which the Court in *Shultz* emphasized by stressing the fact that the reporting requirements involve "transactions which take place across national boundaries." *Shultz, supra,* 416 U.S. at 62, 94 S.Ct. at 1518. In contrast, the requirements struck down in *Marchetti, Grosso, Haynes* and *Leary* pertained primarily to domestic activities. The Court believes the Government's power to compel incriminating disclosures of persons seeking to cross our borders, like the Government's power to make warrantless searches at the border, *Carroll v. United States,* 267 U.S. 132, 154, 45 S. Ct. 280, 69 L.Ed. 543 (1925), is exceptional. Customs officers, for example, exercise broad authority to compel invoices and manifests of merchandise imported into the United States, 19 U.S.C.

§§ 1431, 1459, 1481, 1485, in order to enforce the collection of customs duties under the Tariff Act of 1930. This legislation has been upheld under the Fifth Amendment, in spite of its incriminating potential. *See, e. g., United States v. Vaught,* 434 F.2d 124 (9th Cir. 1970), *cert. denied,* 401 U.S. 976, 91 S.Ct. 1197, 28 L.Ed.2d 326 (1971). Similar legislation authorizing Immigration and Naturalization officers to interrogate persons over their objection as to their right to be in the United States (See, 8 U.S.C. § 1225(a)) has been upheld as not violative of Due Process. *Laqui v. Imm. & Nat. Serv.,* 422 F.2d 807 (7th Cir. 1970); *Henriques v. Immigration & Nat. Serv., Bd. of Imm. App.,* 465 F.2d 119, 120 n.2 (2d Cir. 1972). Although the reporting requirements of the customs and immigration laws are primarily regulatory in nature, the Court believes they bear a more direct analogy to the requirements challenged in this case, in terms of the interplay of governmental and individual interests which they create, than the requirements struck down in cases relied upon by the defendant.

At the same time, the individual liberties at stake in this case, though by no means to be "treated lightly," *Byers, supra,* 402 U.S. at 427, 91 S.Ct. 1535, are not as seriously jeopardized as in *Albertson* or *Marchette* and their progeny. The Court has already pointed to important factors which make the dangers of self-incrimination created by the foreign reporting requirements comparatively less substantial: (1) their general applicability to *all* persons crossing the borders with more than $5,000; (2) the comparative neutrality of the disclosures required; and (3) the possibility of avoiding the reporting requirements, without incurring criminal liability, simply by arranging to carry less than $5,000 at each border crossing. In this regard, the comments of the plurality opinion in *Byers* are pertinent here:

An organized society imposes many burdens on its constituents. It com-

mands the filing of tax returns for income; it requires producers and distributors of consumer goods to file informational reports on the manufacturing process and the content of products, on the wages, hours, and working conditions of employees. Those who borrow money on the public market or issue securities for sale to the public must file various information reports; industries must report periodically the volume and content of pollutants discharged into our waters and atmosphere. Comparable examples are legion.

In each of these situations there is some possibility of prosecution—often a very real one—for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. Information revealed by these reports could well be "a link in the chain" of evidence leading to prosecution and conviction. But under our holdings the mere *possibility* of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here. (emphasis supplied).

*Byers, supra* at 427–428, 91 S.Ct. at 1537.

In spite of underlying prosecutorial purposes, the foreign reporting requirements of the Bank Secrecy Act and Regulations create only a "possibility" of incrimination which in the Court's opinion is not sufficient to require invalidation.[8] Compliance with the requirements "does not by itself implicate anyone in criminal conduct." *Byers, supra* at 434, 91 S.Ct. at 1541. Although the disclosures demanded on Form 4790 "when made known, may lead to inquiry that in turn leads to arrest and charge, those developments depend on different factors and independent evidence." *Ibid.* Compelling those disclosures does not undermine the accusatorial system of criminal justice which the privilege against self-incrimination was designed to protect. For that reason, the Court is constrained to hold, in what appears to be a case of first impression, that the foreign reporting requirements of the Act and Regulations are not violative of the Fifth Amendment.

 We turn now to the defendant's First Amendment claim. The Court is unable to find any indication in the record that compulsory disclosure of the information sought from Mrs. San Juan in Form 4790 would have a deterrent or detrimental effect upon her freedom to enter into associations or to participate in organizations. It is true that governmental power to compel disclosures of membership in organizations engaged in advocacy of particular beliefs is severely restricted under the First Amendment. *NAACP v. Alabama,* 357 U.S 449, 460–462, 78 S.Ct. 1163, 2 L.Ed. 2d 1488 (1957); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231

8. At the hearing on October 29, defendant's counsel argued that compliance with the reporting requirements could expose defendant to criminal liability under the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 et seq., 18 U.S.C. § 951, which generally requires persons acting in this country as agents of foreign principals to notify the Secretary of State. There was no testimony at the hearing which would indicate that defendant was acting as an unregistered foreign agent in transporting money into the United States. However, even assuming that Mrs. San Juan was acting in that capacity, the reporting requirement created only a remote *possibility* that she would be incriminated under the Foreign Agent Registrations Act by completing Form 4790. First, the questions on the Form were not designed to ferret out unregistered foreign agents and do not make specific inquiry in that direction. Second, if Mrs. San Juan feared that a particular question on Form 4790 might tend to incriminate her as an unregistered foreign agent, she was privileged to refuse to answer that particular question without violating the reporting requirements. She could not, however, refuse entirely to fill out and submit the Form. *See, United States v. Sullivan,* 274 U.S. 259, 263, 47 S.Ct. 607, 71 L.Ed. 1037 (1927).

(1960); *Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971). But no such disclosures are sought by the government in this case.

The only question on Form 4790 which inquires into Mrs. San Juan's associations with other persons is Question No. 27, which asks: "Were you acting as an agent, attorney, or in other capacity for anyone in this currency or monetary instrument activity?" To that question, a "yes" or "no" answer is required. If Mrs. San Juan had completed Form 4790 and answered "yes" to Question No. 27, she would then have been required to give the name, address, and business activity, occupation, or profession of the person in whose behalf she was acting. There was no inquiry into Mrs. San Juan's beliefs or her membership in groups or associations espousing particular beliefs. At most, the disclosures in Form 4790 would have revealed only an agency relationship of a financial or fiduciary nature existing between Mrs. San Juan and another person or entity.

This type of government inquiry is very different from one enjoining the Alabama Chapter of NAACP to turn over its membership lists, disallowed in *NAACP v. Alabama, supra,* or compelling a school teacher to disclose all his organizational connections over the previous five years, disallowed in *Shelton, supra,* or requiring an applicant for admission to the Arizona Bar to state whether she had ever been a member of the Communist Party or of any subversive organization, disallowed in *Baird, supra.* See also, *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *Application of Stolar,* 401 U.S. 23, 91 S.Ct. 713, 27 L.Ed.2d 657 (1971). To the extent that Form 4790 inquires into defendant's affiliations or associations, it does not threaten protected as-

sociational rights. See, *NAACP v. Alabama, supra,* 357 U.S. at 462, 78 S.Ct. 1163. We therefore hold that the foreign reporting requirements of the Act and Regulations do not violate the First Amendment.

 Defendant also has moved for discovery of any electronic surveillance by government agents. This motion was denied at the hearing upon the representation of the Assistant United States Attorney that there has been no electronic surveillance resulting in information used in connection with the case.[9] However, both parties were granted leave to file memoranda of law in support of their respective positions with the understanding that the Court would reconsider the motion if persuaded that it should do so. Defendant in her memorandum filed November 14, 1975 urges that the oral disclaimer by the United States Attorney is insufficient and asks the Court to direct the Government "to file an absolute disclaimer in appropriate affidavit form that there has been no electronic surveillance of the defendant prior to the events that occurred on March 30, 1975." This the Court declines to do upon the strength of the Government's representations and the absence of a sufficiently strong showing by the defendant and her counsel that there is reason to believe surveillance has occurred. See *United States v. Alter,* 482 F.2d 1016, 1026 (9th Cir. 1973). Accordingly, the Court's denial of defendant's motion is reaffirmed.

Finally, defendant filed a motion to suppress and return to her the $77,500 and the documents, letters, and memoranda seized by the Government on March 30, 1975. Defendant claims that the search and seizure were "suspicionless" in violation of her rights under the Fourth Amendment. At the hearing on October 29, testimony in connection with

9. The Government reasserted in its memorandum filed November 25, 1975 that there has been no such electronic surveillance in this case.

this motion was taken from Robert M. Johnson and Joan K. McClatchey, Customs Inspectors, and Robert F. Mercier, Special Agent for the Customs Service. At the conclusion of the hearing, the Court denied the motion to suppress but granted leave to counsel to file memoranda of law with the understanding the motion would be reconsidered if the memoranda indicated that reconsideration was warranted.

Memoranda having been filed, the Court now finds the following facts from the testimony of Customs Inspector Johnson, a highly credible witness. At the Canadian border, Inspector Johnson conducted a routine examination of the one piece of baggage which defendant was carrying on board the bus. This examination disclosed two brown paper packages at the bottom of the bag. Defendant said the packages contained books, but Johnson determined that the contents of the packages should be inspected for contraband or dutiable goods and decided to conduct the inspection of the packages inside the Customs Station in order to spare Mrs. San Juan the embarrassment of having her baggage examined further in the presence of other passengers on the bus. When Johnson took defendant's bag and asked her to come inside, she became extremely nervous, arousing the inspector's suspicions. Although the inspector attempted to calm Mrs. San Juan, she continued to be nervous as the bag was placed on a counter and opened for further inspection. Opening the brown paper packages, Johnson and Inspector McClatchey, who was assisting him, discovered a sum of money estimated to be in excess of $5,000 and a number of letters and other documents. The packages were then turned over to Port Director Scott and have remained in government custody ever since.

■ Upon these facts, the Court concludes that the search and seizure were well within the power of the government under applicable statutes and regulations, and under the Fourth Amendment. Customs officers are empowered to examine "the baggage of any person arriving in the United States in order to ascertain what articles are contained therein and whether subject to duty, free of duty, or prohibited . ." 19 U.S.C. § 1496; see also, 19 U.S.C. § 1461; 19 C.F.R. § 162.6. Examination of baggage is permitted upon entry at the border whether or not the customs officer is "suspicious" of the owner of the baggage. *Henderson v. United States*, 390 F.2d 805, 808 (9th Cir. 1967). Inspector Johnson was therefore within his power in examining not only the contents of Mrs. San Juan's bag but also the contents of the brown paper packages. He needed no suspicion to act, since either container might have held contraband or dutiable goods. The entire search was conducted in a manner that was not only "reasonable" under the Fourth Amendment, but also courteous and considerate.

■ Even if "suspicion" were needed to justify the inspection of the brown paper packages, which we doubt, such suspicion was amply supplied by Mrs. San Juan's extremely nervous behavior upon being asked to accompany Inspector Johnson into the Customs Station. *United States v. Glaziou*, 402 F.2d 8, 15 n.5 (2d Cir. 1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969).

■ Defendant also cannot legitimately object to the seizure of the money she was carrying. Forfeiture was proper under 31 U.S.C. § 1102(a)[10] and

10. 31 U.S.C. § 1102(a) provides as follows: (a) Any monetary instruments which are in the process of any transportation with respect to which any report required to be filed under section 1101(a) of this title either has not been filed or contains material omissions or misstatements are subject to seizure and forfeiture to the United States.

31 C.F.R. § 103.48,[11] since defendant failed to fill out form 4790, as required by 31 C.F.R. § 103.25(b).[12] The letters and other documents in the packages were properly seized as evidence in connection with defendant's alleged violation of the statute and supporting regulations. *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). There is no necessity for the Court to disturb the denial made at the time of the hearing of defendant's motion to suppress.

For the reasons stated in the first part of this opinion, defendant's motion to dismiss the information on the grounds that the reporting requirements violate the First, Fourth, and Fifth Amendment, is denied, and it is so ordered.

11. 31 C.F.R. § 103.48 provides as follows: Any currency or other monetary instruments which are in the process of any transportation with respect to which a report is required under § 103.23 are subject to seizure and forfeiture to the United States if such report has not been filed as required in § 103.25, or contains material omissions or misstatements. The Secretary may, in his sole discretion, remit or mitigate any such forfeiture in whole or in part upon such terms and conditions as he deems reasonable.

12. See note 1, *supra*. Mrs. San Juan also persisted in her refusal to fill out the form after being made fully aware of the reporting requirement and being given ample opportunity to comply with it, once the money was discovered.